OPINION OF THE COURT
Edward J. Greenfield, J.
In dealing with a life-threatening situation or with a seri *1077 ously disabled patient, a court may sometimes be called upon to make the difficult decision between the fiercely competing claims for survival and prolongation of life on the one hand and the minimizing of the suffering and agonies of the patient on the other. This case poses such a choice for the court.
Monsignor Thomas O’Brien is now 83 years of age. For many years he served his church and his God as pastor at St. Paul’s in Harlem, St. Anastasia’s in The Bronx and St. Malachy’s (the Actor’s Chapel) in Manhattan, where he served after retirement as pastor emeritus. From all accounts, he was a lively, gregarious, loving man, and avid reader, a rapt conversationalist, and a good friend to the members of his parish. His interests were not only Catholic in the religious sense, but universal and Catholic in the broadest meaning of the term. For a man like that, where activity and communication were such a vital part of his life, the disabling stroke he suffered on May 25, 1986 was a terrible tragedy. This vibrant and loving man was reduced to a mere shell of his former self. The stroke not only restricted his movements, but made it almost impossible for him to swallow and take nourishment. It further rendered him incapable of speech. To keep him alive, a naso-gastric tube was inserted through his nostrils and down through his stomach. This tube proved to be a source of great irritation and discomfort to Msgr. O’Brien and he attempted to remove it at least 15 times.
Under these circumstances, Sister Rita Kerr, executive director of the Frances Schervier Home and Hospital in Riverdale, petitioned this court for the appointment of a conservator to consent on Msgr. O’Brien’s behalf to the performance of a gastroatomy as a life-saving procedure to insure his continued nourishment. Jonathan Herlands, Esq., was appointed guardian ad litem and Debra Marcus appeared on behalf of the Attorney-General of the State. A hearing was held before this court on September 11, 1986, attended by the attorneys and at that time, there being some conflict in psychiatric testimony as to whether Msgr. O’Brien was or was not competent to make a decision as to the continuation of life-sustaining procedures, this court directed the performance of a gastroatomy so that the irritating naso-gastric tube could be removed and nutrition continued through a tube inserted directly through his abdomen. The purpose was to continue his life until such time as additional psychiatrists could examine him and determine whether he was or was not competent to decide for himself on the maintenance of life-sustaining *1078 equipment. That operation was performed on September 17, 1986, and feeding through that tube is continuing to date. On a few occasions, Msgr. O’Brien has been able to take orally a few spoonfuls of ice cream or pureed or liquified food.
On October 28, 1986 this court, having received the report of the guardian ad litem, also heard the testimony of Sister Kerr, the additional psychiatrists who had examined Msgr. O’Brien, Father Orson, director of the Pope John Paul Residence, where Father O’Brien resided before the stroke, and his long-time and devoted good friend Charles Fitzpatrick.
It was essentially the conclusion of the four examining psychiatrists that despite initial doubts on earlier examination, Msgr. O’Brien was not so depressed or withdrawn as to render him incapable of making a rational decision affecting his life. His friend, Mr. Fitzpatrick, is sure that he understands Msgr. O’Brien’s wishes and feels that the feeding tube is denigrating. He feels he speaks for his friend in urging that the tube be removed so that Msgr. O’Brien can live with dignity and have God, rather than the doctors, decide what should happen to him. The depth and degree of the priest’s understanding is still open to some question, since he could communicate only through a squeeze of the hand or a shake of the head for affirmative and negative responses to questions. It was clear that he was not happy with the tube that was inserted and would have preferred to have it out. When asked if he understood that was necessary to sustain his life, he answered affirmatively. When asked if he wanted to live, his answer was in the negative. When asked if he wanted to die, he likewise responded negatively.
Under those circumstances, the court found it necessary to travel to the bedside of Msgr. O’Brien and to determine for itself his mental competence and his desires as to the maintenance of life-support systems. The court observed that his degree of alertness varied considerably from moment to moment. He had not been sedated, although he had been given an antidepressant some four hours before the interview. He was able to respond to some questions with an affirmative squeeze of the hand, to shake his head negatively as to other questions, and to avert his gaze or not respond at all to the more difficult questions. His eyes would close and his head would nod at several points during the interview. Indeed, he appeared to be on the verge of being semicomatose. He clearly answered that he did not want to die and that he found the tube uncomfortable and irritating, but he did not affirmatively *1079 indicate that he wished to have it removed. It would appear that as a devout observant Catholic, Msgr. O’Brien would do nothing affirmative to hasten his death, although it may well be, as Mr. Fitzpatrick surmises, that he would welcome death as an escape from his suffering.
The law is clear that every competent adult has the right to accept or decline particular medical treatment, and if he or she is capable of a rational and competent decision, such a patient has a right to decline life-saving procedures. (Matter of Eichner [Fox], 102 Misc 2d 184, mod 73 AD2d 431; see, Annotation, Patient’s Right to Refuse Treatment Allegedly Necessary to Sustain Life, 93 ALR3d 67.) When a person is not competent to make such a life or death decision, the court must intervene in favor of life-prolonging treatment, despite the feelings and desires of those closest to the patient. (Matter of Storar, 52 NY2d 363, cert denied 454 US 858.) Artificial life-support measures such as forced feeding through a tube may, in some jurisdictions, be rejected by the incompetent or comatose patient’s family. (Bouvia v Superior Ct., 179 Cal App 3d 1127, 225 Cal Rptr 297, and cases cited therein; Corbett v D’Alessandro, 487 So 2d 368 [Fla].) In this case, the one who purports to speak for the patient is not a member of the family, but a close friend.
The court concludes on the basis of a necessarily limited interview and on further questioning of the hospital staff as to the patient’s degree of alertness and understanding, that while Msgr. O’Brien is capable of understanding and reacting to his basic needs and wants, and perfectly capable of expressing his irritation (a verbal "Boy Oh Boy!” can be heard when the patient appears to be thoroughly frustrated, disgusted or fed up), he is not competent to make the profound decisions about medical treatment, the prolongation of life and the theological implications which would follow from a removal of the feeding tube on demand. This court is not prepared to order discontinuance of this life support based upon gestures of irritation or annoyance. It is significant that since the insertion of the abdominal feeding tube, there appears to have been no further repetitions of the attempt to remove it (although it was found displaced at one point, possibly inadvertently).
Life and death are not to be determined by the interpretation of a passing gesture or expressions of annoyance and frustration. I am sure, as the patient’s friend urges, that the disabling stroke and the force-feeding are painful and humili *1080 ating and demeaning to the dignity of a once proud and vibrant human being. Pain, humiliation and indignity do not of themselves warrant the cessation of life. I am sure that Msgr. O’Brien would want his fate to be in the hands of God. This court is not prepared to make decisions reserved for the Deity. It will not order the discontinuance of a life-support mechanism without the clearest and most compelling indications from the person most directly involved. Whenever there is doubt, a court must opt for the affirmation of life.
Accordingly, this court will direct the continuance of Msgr. O’Brien’s treatment at the Frances Schervier Home. It will grant the petition to the extent of declaring Msgr. O’Brien incompetent to handle his financial affairs and will designate Father Lawrence Orson as conservator of his finances.
The court wishes to express its appreciation for the intelligent, diligent and sensitive devotion given to this case by the guardian ad litem, Jonathan Herlands, Esq., and also to Ms. Debra Marcus, Esq., of the Attorney-General’s office, and Thomas J. Ford, Esq., who appeared on behalf of the petitioner. The staff of the Home are to be commended for their loving and dedicated care, and above all the court must express its appreciation and commendation to Msgr. O’Brien’s devoted, attentive and loving friend, Charles Fitzpatrick. His integrity and concern define what true friendship is all about.