OPINION OF THE COURT
Melvin S. Barasch, J.
*563 The above-captioned petition, brought before this court by order to show cause, requests this court for an order directing respondents to withhold all medical treatment except that necessary to keep the petitioner comfortable and to alleviate pain. It is opposed by respondents. The relevant facts are as follows:
Petitioner Celia Blackman is a woman 88 years of age. She is a retired pediatric nurse. Petitioner Brent Ribnick is her 27-year-old grandson. On or about February 1, 1997, Celia Black-man was admitted to respondent Coney Island Hospital for treatment of pneumonia. (To date, there has been no further diagnosis.) She remains a patient there, under the care and treatment of respondent’s physicians. It bears noting that prior to her being admitted to the hospital, she lived by and looked after herself, visited on a periodic basis by Sister Mary Ellen Brennan, a case manager with Catholic Charities, who in addition to providing social services, had arranged for Meals on Wheels for Mrs. Blackman.
At the time the order to show cause was served, Mrs. Black-man, although conscious, was being supported by a ventilator which was connected to her orally by means of an endotracheal tube, and by a nasogastric feeding tube. At the present time, she continues to remain intubated to the ventilator, but receives nourishment by means of intravenous feeding rather than the nasal tube. She remains dependent on both means of life support. In addition, since entering the hospital, she has lost almost 100% of her hearing, possibly as a result of the administration of antibiotics, and while she appears to be severely myopic, she does not have, and possibly does not own, corrective lenses to ameliorate this condition. The presence of the endotracheal tube renders her unable to speak. Physically, she is severely emaciated and appears to weigh approximately 50 pounds. Her arms are covered with scars and bruises resulting from the insertion of needles and tubes. Although she remains in a constant state of physical discomfort, if not pain, and is severely isolated from outside stimuli by reason of her hearing loss and limited vision, it is agreed by both sides (and confirmed by this court’s own observations) that Mrs. Black-man is mentally competent.
The crux of respondents’ opposition to this application centers around Mrs. Blackman’s consent, twice given and twice revoked, for the performance of a tracheostomy which would obviate the need for the oral endotracheal ventilator tube by relocating its entrance through an incision in her throat. In this way, according to respondents’ arguments, she would ex *564 perience substantially less discomfort than she now does; she would begin receiving solid food approximately one week following the surgery, and could possibly, after the passage of time and after regaining her strength after she resumed eating, be weaned from the ventilator. Respondent Coney Island Hospital’s (hereinafter referred to as The Hospital) opposition to this petition is based upon its belief that the patient is being guided not by her own wishes, but rather by those of her grandson Brent Ribnick, who is the only relative with whom she has a close, if not confidential relationship, and who has been designated her health-care proxy in the event she is unable to make her own determinations and decisions regarding health care.
This court conducted an extensive fact-finding hearing over the course of several days, which included a bedside interview with Mrs. Blackman at Coney Island Hospital. Following the testimony of the last of respondents’ witnesses, the court ordered The Hospital to engage a psychiatrist to examine her and testify as to his findings. Petitioners then hired their own psychiatrist to examine Mrs. Blackman. Both experts testified in court after examining her and evaluating her mental condition. Due to her hearing loss and inability to speak, all questions, including those of the court at the time of the bedside proceeding, were put to Mrs. Blackman in writing, and she answered them in writing. She must hold pages containing printed questions within two to four inches of her eyes in order to read them.
Through the testimony of Brent Ribnick and Denise Faucher, a licensed practical nurse who testified that she was a friend of Mr. Ribnick’s and who maintained frequent contact with Mrs. Blackman, the court learned of Mrs. Blackman’s independent nature and opposition to being maintained on a life-support system. Ribnick testified that she pulled out the nasogastric tube, and twice fought off the team that inserted the IV tubes. She refused the tracheostomy by writing dated March 28 — on the same date, she also said "I, Celia Blackman, do not want your treatment or your services any longer. I am in pain and am miserable too”. By a notarized letter dated April 2, 1997 and addressed to Doctors Yankelovitz, Rosen, Friedman and Kalola (all affiliated with The Hospital), Mrs. Blackman wrote:
"Dear Doctor Yankelovitz, et al, I am writing this letter to you to request that you withdraw the use of respiratory support and artificially administered feeding and fluids. I feel that *565 it is within my rights and request that such treatment be withheld.
"I make this request with full knowledge that withholding such treatment may cause my death. I request that you limit treatment only to alleviate pain even if it causes my death. Thank you for honoring my wishes”.
This letter, introduced as an exhibit during the course of the hearing, was accompanied by an affidavit of Brent Ribnick stating that he discussed its contents with Celia Blackman and she requested that treatment be withheld, and therefore joined in her request. Ribnick testified that none of the doctors to whom this letter was sent ever contacted him after it was mailed.
However, Ribnick testified that on April 1, following his success in getting through by telephone to Dr. Yankelovitz, he learned that pursuant to her written authorization, Mrs. Black-man was being prepped for the tracheostomy; that he rushed over to The Hospital, and personally told Dr. Yankelovitz that her true wishes were to the contrary. Dr. Yankelovitz agreed to postpone the surgery.
However, Mrs. Blackman subsequently executed another form consenting to the tracheostomy, consisting of three pages, on April 9, which Ribnick testified that he was unaware of until he came to court on Friday, April 12. On the following day, he visited Mrs. Blackman in The Hospital, and obtained from her a handwritten note, notarized, stating: 'T was confused about some decisions I made on Friday. Mr. Berger came in and upset me. Yes, I want to be off the respirator. I don’t want the food feeding in my nose anymore. I want the IV tubes out of my arms and I am in pain. I am competent and of sound mind and I understand what I wrote about”. This note was signed by Mrs. Blackman, witnessed by Denise Faucher, and signed also by Brent Ribnick who identified himself as power of attorney.
Finally, Mr. Ribnick testified that he communicated to his grandmother what he had learned from speaking to doctors about her long-term prognosis following the tracheostomy, including the probability that she would be referred to a nursing home. She indicated her opposition to surgery; that although she wanted to go home with Mr. Ribnick, she was prepared to take the chance that she would die if the tubes were removed rather than continue to live the life she was now living. He stated his belief that his grandmother had no chance of being weaned from the ventilator if she were to have the tracheostomy.
*566 Denise Faucher also testified as to the number of times Mrs. Blackman repeatedly expressed to her the wish to go home, to have the tubes removed from her, and her awareness of the consequences of disintubation. She additionally testified as to her familiarity with tracheostomies from contact with patients in nursing homes who had had the surgery, and further that she did not believe that Mrs. Blackman desired to end her life.
Dr. Mahesh Krishnamoorthy, a second-year resident at Coney Island Hospital called by respondents, testified that he had had at least 20 patients who underwent tracheostomies, and further testified as to his conversations (in writing) with Mrs. Blackman wherein he advised her of the benefits and risks of the surgery. He stated that he was unable to learn from her why she was rejecting having the operation, but that he understood that her family didn’t want the procedure. Nevertheless, he felt that the prognosis was "just like any 88 year old” (transcript, at 144), which included the possibility of respirator dependency.
Jennifer Garofolo was employed by The Hospital as a patients’ advocate, whose role was to inform patients about their rights, advocate for them, and educate them about advance directives. She became actively involved with Mrs. Blackman on March 7, and had learned from speaking with Brent Ribnick that he was opposed to the tracheostomy "and the patient would not want it” (transcript, Apr. 17, 1997, at 63). On April 10, she spoke with Mrs. Blackman, who expressed a desire to eat and asked Ms. Garofolo questions about the tracheostomy. (During the course of their conversation, Mrs. Blackman wrote that "E. Taylor had that done”.) On April 11, Garofolo again visited Mrs. Blackman, and noted that although she (Garofolo) raised the subject of the tracheostomy, Mrs. Blackman did not respond thereto. She also spoke with Sister Brennan and Mrs. Blackman’s neighbor, one Ms. Toth, and testified that both those individuals agreed that "the grandson does not seem able to handle the situation”.
At some point, Mrs. Blackman indicated to Garofolo her desire to go to her grandson’s home and stay with him and his dog. Several days later, Mrs. Blackman expressed concern about the payment of her bills to Garofolo. She told Garofolo that she was confused; to which Garofolo responded that "You want to please Brent and you want to be more comfortable and eat” (transcript, at 80). On March 28, Mrs. Blackman was unwilling to talk to Garofolo, and on March 31, she indicated her refusal to have the tracheostomy. Statements indicating *567 this continued refusal, along with indications of confusion, were obtained from April 3 through April 9.
Garofolo stated her belief that she did not believe that Mrs. Blackman expected that she would die; that her hope was to go home with her grandson and his dog; and that she did not fully understand the consequences of having the endotracheal tube removed.
Following the court’s directive, the petitioners called Dr. Richard Krueger, a psychiatrist, to the stand. He testified that he met with Celia Blackman on April 21, and spent approximately l1/2 hours with her, without Ribnick being present. He identified himself as a psychiatrist. In answer to Dr. Krueger’s questions, she indicated that she was depressed, but that she was not suicidal. She indicated that she did not want to have the tracheostomy; that she wanted to have the respirator stopped; and that regarding the certainty of death if this were done, she "would take her chances” (transcript, Apr. 24, 1997, at 14). Krueger then asked some questions to check Mrs. Blackman’s orientation, and then in answer to the question as to why she refused to have the tracheostomy twice, she wrote (confusing Dr. Krueger for her grandson), "Because I wanted to be with you and Denise” (transcript, at 15). Dr. Krueger then asked her why she changed her mind about having the tracheostomy. Possibly continuing to misperceive Dr. Krueger’s identity, she wrote "because that is what you wanted” (transcript, at 16). Finally, successfully reorienting Mrs. Black-man toward understanding who he was, Dr. Krueger asked her if she wanted to be taken off the respirator, to which she wrote "yes”, and upon telling her that it would mean her death, she replied "so what” (transcript, at 16). She denied feeling pressured by Brent in making her decision.
Dr. Krueger testified that it was his belief that Mrs. Black-man was capable of making her own decisions concerning her medical treatment, and that he did not believe that she was being influenced by her grandson. It was his opinion that she understood that she will die if she is disconnected from the respirator, and that she does not presently want the tracheostomy even if she will live. In reaching his opinions, Dr. Krueger stated that he gave substantial weight to Mrs. Blackman’s background as a nurse and to her independent nature.
Dr. Krueger acknowledged that Mrs. Blackman was depressed, and that depression would probably be relieved by an improvement in her hearing and upon gaining an ability to eat. He also acknowledged, based upon her statement regard *568 ing Brent Ribnick’s wishes, that this did show that he had influence in the situation, and that he was concerned about the quality of information that Ribnick might be receiving about her being weaned from the respirator. Nevertheless, he believed that Mrs. Blackman wished to be removed from the respirator by whatever means. He opined that her quality of life was "terrible”.
Respondent called Dr. Norman Levy, The Hospital’s Director of Psychiatry, to testify following his two examinations, on April 21 and April 23, of Mrs. Blackman. At the outset, he stated his belief that she has the capacity to deal with her own medical decisions, and that while she "spilled the beans” to Dr. Krueger regarding her grandson’s influence in her decision-making process, she appeared to understand the consequences of those decisions, and he did not believe that there was anything unethical in family members counseling one another. (However, he did admit that he never interviewed Ribnick). Moreover, Dr. Levy believed that Mrs. Blackman is depressed, and that while a successful tracheostomy will relieve the depression to some extent, he is of the opinion that she has "given up” at this time. He characterized her present quality of life as "miserable”. He observed that she is presently living in an unair-conditioned room which she shares with five other patients, and that she is unable to hear, speak, see, read or watch television.
The court’s own examination of Mrs. Blackman took place at Coney Island Hospital on April 16. Also present at that time were the attorneys for petitioners and respondents, the official court reporter, Mr. Ribnick, and the court’s law secretary. A set of interrogatories was prepared in advance, and she wrote the answers thereon. At the time, she was alert and lucid. She was aware of who the court was, the reason for its being there at that time, and the nature of the proceedings. She answered all questions under oath. When asked if she understood that she would die if the food tube and respirator were removed, she wrote "It is a living death now. I will take that chance”. She stated that she was advised of the consequences, and that she had been advised that she would be able to eat at some time after she had the tracheostomy. When asked if she wanted to live or die, she wrote "I will take that chance”, and further wrote "no” when asked if she would consent to an operation that would make it possible for her to eat and stay alive.
It has long been the common-law rule in the State that a person has the right to decline medical treatment, even life *569 saving treatment, absent an overriding State interest. (Matter of Westchester County Med. Ctr. [O’Connor], 72 NY2d 517, 528, citing Schloendorff v Society of N. Y. Hosp., 211 NY 125, 129-130.) A hospital must respect this right if, while competent, the patient states that he or she did not want certain procedures to be employed under specified circumstances (Matter of Storar, 52 NY2d 363). While the Legislature has now authorized third parties to issue "do not resuscitate” orders for incompetent patients under certain circumstances (Public Health Law art 29-B), the right to decline treatment remains a personal one and under existing law in this State could not be exercised by a third party when the patient is unable to do so. (Matter of Westchester County Med. Ctr. [O’Connor], supra; People v Eulo, 63 NY2d 341.) In Matter of Eichner v Dillon (52 NY2d 363) the Court of Appeals selected the "clear and convincing evidence” standard as that burden which must be met by a party seeking to establish what the directives of a patient would have been had he or she been competent and able to communicate (52 NY2d, at 379; see also, Matter of Delio v Westchester County Med. Ctr., 129 AD2d 1; Addington v Texas, 441 US 418, 424), based upon its belief that it " 'impresses] the factfinder with the importance of the decision’ * * * and it ' " 'forbids relief whenever the evidence is loose, equivocal or contradictory’ ” ’ ” (Matter of Storar, supra, at 379). Nothing less than unequivocal proof will suffice when the decision to terminate life supports is at issue. (Matter of Westchester County Med. Ctr. [O’Connor], supra, at 529.)
The underlying facts in Matter of Westchester County Med. Ctr. (O’Connor) (supra) differ significantly from those in the case at bar, since Mrs. O’Connor was an elderly woman who, as a result of several strokes, was unable to obtain food and drink without medical assistance, but unlike here, was found to be mentally incompetent. Her daughters, both practical nurses, claimed that it was contrary to their mother’s "expressed wishes” to remain on life support; submitted evidence of their mother’s wishes prior to her becoming incompetent; and opposed the hospital’s application to insert a nasogastric tube which was the only means by which the patient could obtain nourishment and liquids following the loss of her gag reflex and her ability to swallow. The majority found, based upon a review of contexts in which Mrs. O’Connor made various statements in the past about her desire to decline lifesaving treatments, that there was nothing, other than speculation, to persuade the factfinder that her expressions were more *570 than immediate reactions to the unsettling experience of seeing or hearing of another’s unnecessarily prolonged death. (72 NY2d, at 532.) In concluding that the record failed to show that Mrs. O’Connor elected to die under circumstances whereby she would consciously and slowly starve and dehydrate without intubation, the Court reversed the order of the Appellate Division and granted the hospital’s petition.
By contrast, the obvious distinction here is the patient’s ability and competence to express and communicate her own wishes and directives regarding her health care treatment. For this reason, none of respondents’ arguments which rely on cases where the patients were found to be incompetent (Matter of Storar, supra; Matter of O’Brien, 135 Misc 2d 1076) are relevant in this context. More appropriate for this court’s consideration is the background and holding in Matter of Fosmire v Nicoleau (75 NY2d 218), where the Court of Appeals held that where a competent adult Jehovah’s Witness refused to consent to blood transfusions prior to delivery of her baby and persisted in that refusal, the hospital and the court that signed the order authorizing the hospital to give transfusions to the patient, acted improperly. Citing Matter of Westchester County Med. Ctr. (O’Connor) (supra) the Court ruled that in such a proceeding, "the court should consider whether the patient has made a decision to decline the medical treatment, is fully aware of the consequences and alternatives, and is competent to make the choice. If the patient is not presently competent the court must determine whether there is clear and convincing evidence that the patient, when competent, made a firm resolve to decline treatment”. (75 NY2d, at 225 [emphasis provided].)
Thus, the "clear and convincing” standard so vociferously asserted by respondents as the cornerstone of their opposition to this petition appears to command the court’s consideration only in those cases where the patient is not found to be competent, and past indications of intent and desire must be probed in order for the court to reach a just determination. Absent that, the court must only weigh the interests of the individual against the interests asserted on behalf of the State to strike an appropriate balance. (Matter of Fosmire v Nicoleau, 75 NY2d 218, 226-227.)
Here, respondents have failed to argue, or even identify, any compelling interest that the State might have in this equation. Moreover, they have failed to come forward with any rational reason why Mrs. Blackman’s wishes should not be given full *571 force and effect. While appearing to give weight to her vacillations in the cycle of consents and revocations, they have not, with the exception of Mrs. Garofolo’s limited testimony, offered the court any insight into the means by which they obtained her "informed” consent on forms consisting of three minutely typed pages filled with legalese, given the fact that she is severely limited in her ability to read and cannot hear.
Moreover, while respondents argue a somewhat nebulous concept of "undue influence” being exerted to overcome Mrs. Blackman’s free will, they have failed to support this claim with any evidence, or bring before this court any legal authority, in this or in any other jurisdiction, which would support such a claim in this context. While the role of Mr. Ribnick, and, to a less definable extent, Ms. Faucher, as influences on Mrs. Blackman, in her depressed and at times confused state, cannot be ignored, there is no showing of irresponsibility, overreaching, or financial gain on either of their part.* By the same token, the court cannot ignore the competing influences being exerted on her decision-making process by The Hospital’s own staff, which undoubtedly (as was borne out by Ms. Garofolo’s testimony) contributed to this confusion. While there has been ample testimony that The Hospital possesses the machinery to prolong Mrs. Blackman’s life, the record is silent as to its having counseled her as to the quality that life will assume if she undergoes the surgery. The court finds this particularly disturbing in view of the serious issues raised by her hearing loss and limited vision.
As respondents’ own witness, Dr. Levy, indicated, there is nothing unethical where one family member counsels another. While the evidence obviously demonstrates that Mr. Ribnick opposes any further intubation of his grandmother and on many occasions plainly made this fact known to her, the court is satisfied that Mrs. Blackman’s decision is the product of her own mind. This is so regardless of whether she believes she will die or survive following disintubation, since the unambiguous manifestation of her intent since launching this proceeding has been to refuse the surgery, regardless of any possible benefits. Once arrived at, respondents had the clear duty to honor this decision and not tax her, her family, and her resources by opposing this application, since "no person or court *572 should substitute its judgment as to what would be an acceptable quality of life for another” (Matter of Westchester County Med. Ctr. [O’Connor], 72 NY2d, supra, at 530). Accordingly, the relief sought by the petitioners is in all respects granted, and petitioners shall be entitled to costs and disbursements, as well as reasonable attorney’s fees in the amount of $5,000.

 Testimony was introduced concerning a bank account consisting of approximately $20,000 belonging to Mrs. Blackman, to which Mr. Ribnick had full access. There is no evidence before this court that he has, or intends to, misappropriate it.