OPINION OF THE COURT
Herbert A. Posner, J.
Anna Kushnir is an elderly hospital patient who was admit *353 ted into Parkway Hospital from the Dry Harbor Nursing Home with a diagnosis of pneumonia. Parkway has petitioned the court to perform a procedure called percutaneous endoscopic gastrostomy (PEG) which is basically the surgical insertion of a feeding tube into the stomach and intestines.
A hearing was held in the courthouse on May 1, 1998, at which time Dr. Manuel Hovian testified as to the patient’s mental and physical condition. This was followed by a bedside hearing held at Parkway Hospital on May 4, 1998, during which the court observed the patient and took testimony from her son, Emil Molozanoff, the nutritionist, Marsha Walsh Geissler, and the hospital’s medical director, Dr. Shashi Patel.
FINDINGS OF FACT
Anna Kushnir is a 79-year-old Russian immigrant who was admitted to the Dry Harbor Nursing Home in October 1996 with a diagnosis of Alzheimer’s disease. In the course of the IV2 years at Dry Harbor she has progressively deteriorated both physically and mentally and in January 1998 she became noncommunicative. She is also incontinent and unable to leave her bed. Both Dr. Patel and Dr. Hovian testified that her condition is irreversible and will continue to deteriorate, regardless of whether or not she receives a feeding tube. When observed by the court, she was lying in a fetal position and attempts to communicate with her through a Russian interpreter proved futile. Her son, Emil, is her only living survivor. His father was killed during World War II when-he was three years old, and his mother was both mother and father to him.[1] A year ago Emil consented to a prior PEG procedure. Now that his mother has lost all cognitive function and is in constant pain, he refuses to consent to any procedure that will prolong her life. He volunteered that his decision has nothing to do with money, since his mother’s nursing home and hospital expenses are being paid by Medicare and Medicaid.[2] The court observed Emil’s interaction with his mother and is convinced that his refusal to consent to the feeding tube stems from love and compassion. He visits his mother every day and attempts to feed her by mouth with food he brings into the hospital. The Law Guardian, Gary DiLeonardo, stated that he observed Emil feed his *354 mother a piece of turkey and a strawberry.[3] She is still able to swallow and, in fact, has gained four pounds since April 24, 1998. Her son, however, testified that she cried out in pain whenever anyone touched her or tried to move her body and Dr. Patel stated that with Alzheimer’s patients, pain is the “last of the sensations to go”. He also testified that while hunger and thirst create discomfort, they do not cause pain.
When the son was asked whether his mother had ever expressed her wishes regarding medical treatment, if she became mentally incompetent, he related an incident that took place approximately 10 years earlier.[4] They were watching a program on television about the Von Bulow case. The screen showed Sonny Von Bulow lying in bed in a coma. Emil said to his mother, “It’s good to be rich in this country, Mom, because even in her condition, she still looks like a model.” His mother replied, “No, [even] if you was rich, I wouldn’t want to be in this condition, never.”[5] He could not remember any other conversations along this line.
CONCLUSIONS OF LAW
New York, as well as most States, recognizes the common-law right of a competent person to decline medical treatment. (See, Schloendorff v Society of N. Y. Hosp., 211 NY 125, 129-130; Matter of Westchester County Med. Ctr. [O’Connor], 72 NY2d 517, 528.) However, Mrs. Kushnir is totally incompetent and will never be able to express her wishes regarding the use of the feeding tube. Therefore, the court is placed in the unenviable position of attempting to ascertain the patient’s wishes since this is the subjective standard required by the New York courts. Moreover, in order for the court to determine that the feeding tube should be withheld, the patient’s wishes to that effect must be established by “clear and convincing evidence”. The Court of Appeals selected this standard because it impresses the fact finder with the importance of the decision and it forbids relief whenever the evidence is loose, equivocal or contradictory. (Matter of Storar and Matter of Eichner v Dillon, 52 NY2d 363, 379.) The evidence must be unequivocal when the decision to terminate life support is at issue. (Matter of Westchester County Med. Ctr. [O’Connor], supra, at 529.) In the O’Connor case, relied upon by the petitioner, the Court *355 compared its rulings in Storar and Eichner and related the fact patterns to O’Connor. In Storar, the patient was mentally retarded from birth and was never able to express his wishes concerning the prolongation of life by artificial means. Eichner, on the other hand, involved an 83-year-old man, Brother Fox, who stated, more than once, that he did not want to be kept alive artificially while in a vegetative state. Accordingly, in Storar, the Court denied the family’s request to terminate life support, but in Eichner this relief was granted. The Court of Appeals noted that the facts in the Eichner case were so clear that there was “no need to elaborate upon the kind of showing necessary to satisfy the ‘clear and convincing’ standard.” (Matter of Westchester County Med. Ctr. [O’Connor], supra, at 529.) The Court, however, found the facts in O’Connor to “present a much closer question” (supra) requiring the Court to explore in more detail the application of that standard in determining what the patient would say if asked today whether the treatment in issue should be undertaken or not (supra, at 529-530).
Mrs. O’Connor had expressed her wishes not to be kept alive by artificial means in the past when family members and friends were dying of cancer. At the time of Mrs. O’Connor’s hearing, she was not suffering a terminal illness, but was aged and infirm from two debilitating strokes. She was awake and conscious, able to respond to simple comments, carry on limited conversations and was not experiencing any pain. She was not able to swallow food, because the stroke created a gag reflex problem. The Court said the infirmities she was concerned with and the medical procedures she eschewed should be compared with her condition now and the procedures in question (Matter of Westchester County Med. Ctr. [O’Connor], supra, at 532-533). The Court claimed that this comparison should not be dispositive, but should be only one of the elements to be considered. However, one cannot leave a reading of the decision in O’Connor without the feeling that this analysis was a major “element” in the Court’s final conclusion that “it cannot be said that Mrs. O’Connor elected to die under circumstances such as these” (supra, at 534).
Based on the Court of Appeals case-by-case reasoning in Storar (supra), Eichner (supra) and O’Connor (supra), this court finds that Parkway’s application to use a “PEG” feeding tube for Mrs. Kushnir should be denied. There is clear and convincing evidence that the use of such artificial means to prolong her life is against her wishes and would be futile and unnecessary. She does not have a gag reflex problem, as did *356 Mrs. O’Connor. This patient can swallow liquids and, if fed soft foods, she is able to chew. Concerning the express wishes of the patient, the incident related by the son concerning Mrs. Von Bulow involved a medical condition and medical procedures very similar to this case.[6] Like Von Bulow, who had no cognitive function because of an irreversible coma, Mrs. Kushnir has no cognitive function due to the final stages of Alzheimer’s. Mrs. Von Bulow was not on a respirator but was being kept alive by means of artificial feeding, which is what Parkway wants to do with Mrs. Kushnir. While the son could only relate one incident in which his mother expressed her wishes, the court finds that his recollection of the Von Bulow matter was so unusual for a Russian immigrant that it bears greater weight than the numerous instances recalled by the family members in the O’Connor case. Furthermore, contrary to the Court’s finding in O’Connor (supra, at 533) that “it should not be assumed * * * that she contemplated declining medical assistance when her prognosis was uncertain”, it defies rationality that Mrs. Kushnir would change her mind 10 years after the Von Bulow incident when, for all intents and purposes, she is brain-dead, unable to walk, incontinent and in pain. She has no quality of life whatsoever. Therefore, it can be assumed that she would not have changed her mind about being kept alive as a mere shell of a human being.
It is indeed unfortunate that Judges are called upon to play God in case-by-case situations. These decisions should properly be medical and personal — between the patient’s family and the medical profession. New York is one of the two States[7] that does not have clarifying legislation establishing guidelines for the medical profession and patient’s families. Legislation[8] on this subject has been languishing in the State Legislature for years. Isn’t it about time for New York to remove the psychological pain from families of dying patients, the physical pain of patients themselves, and the terrible burden from the backs of the judiciary? Certainly, this should be done before we embark on the new millennium.
Parkway’s petition for authorization to feed the patient by *357 artificial means is denied. However, Parkway is to take all means necessary to ameliorate the patient’s pain and attempt, if possible, to offer her nutrition by mouth and intravenous.

. Transcript of hearing of May 4, 1998, at 13, lines 5-7.

. Transcript, op. cit., at 12, lines 17-22.

. Transcript, op. cit, at 5, lines 14-21.

. Transcript, op. cit., at 8, lines 10-18.

. It was common knowledge that Sonny Von Bulow was in a coma and was being fed artificially.

. At the May 4th hearing, the son was asked, “was that a similar condition to how your mother is now?” He answered, “In the sense of the brain activity, I think it’s the same.” (Transcript, op. cit., at 12, lines 3-6.)

. Missouri is the other State.

. See, 1997 NY Senate Bill S 4951 and 1997 NY Assembly Bill A 7026.