Vernon Steve Knight and William Edward Knight (hereinafter referred to collectively as "the Knights") appeal the trial court's denial of their request to enjoin a nursing-home facility operated by Beverly Health Care[1] from removing a feeding tube from their mother, who is a resident at the facility. We affirm in part and remand.
On June 6, 2000, the Knights sued Beverly Health Care, seeking to enjoin Beverly Health Care from removing a feeding tube that was providing nourishment to their mother, Delores Cameron. On September 11, 2000, James Cameron, as Delores Cameron's attorney-in-fact and as her husband,[2] filed a motion to intervene in the action; he sought an order implementing Mrs. Cameron's "living will," arguing that the provisions of that document necessitated the removal of the feeding tube. Mr. Cameron's motion to intervene was granted on September 15, 2000. The trial court conducted five hearings on the case between September 22, 2000, and November 21, 2000; on December 6, 2000, it denied the injunction and ordered that the feeding tube be removed.
The sad facts shown by the record in this case are as follows. Mrs. Cameron suffered a massive stroke on February 2, 2000. It was her second stroke, and after treatment at a hospital, she was transferred to Beverly Health Care. Mrs. Cameron's physical condition deteriorated and eventually it was necessary to surgically implant a feeding tube to supply her with nutrition. In March 2000, possibly because of another stroke, she became totally unresponsive, and her attending physician diagnosed her as being in a "persistent vegetative state." Two neurologists were consulted; they supported the diagnosis of her attending physician. Her condition has not changed. Mrs. Cameron's husband of more than 40 years, James Cameron, visited her daily, except for a period during which he was recovering from a heart attack. In June 2000, he requested that his wife's doctors abide by the conditions of a "living will" Mrs. Cameron had executed, which specified that any feeding tube that had been inserted be withdrawn in the event she was in a "persistent vegetative state." The Knights objected to removing the feeding tube and brought the action that is the subject of this appeal.
Evidence concerning Mrs. Cameron's medical condition included the testimony of her attending physician, Dr. David MacRae, and a clinical neurologist, Dr. Fritz Lacour. Both Dr. MacRae and Dr. Lacour testified that, to a reasonable degree of medical certainty, they believed that *Page 94 
Mrs. Cameron is in a persistent vegetative state. Dr. MacRae testified:
 "Q. There's no question, Dr. MacRae, that Mrs. Cameron is unable to feed herself or take care of herself; is that correct?
"A. She is unable to do that.
 "Q. And as such, if it were not for the feeding tube, she would more likely than not be alive [sic] today; is that correct?
"A. That's correct.
 "Q. Dr. MacRae, if I define for you a persistent vegetative state as a condition which will last permanently without improvement in which thought, sensation, purposeful action, social interaction, and awareness of self and environment are absent and which has existed for 30 days since the diagnosis, would you say that that definition of persistent vegetative state is the same or would comport with your diagnosis of persistent vegetative state as it applies to Mrs. Cameron's condition?
"A. Yes.
". . . .
 "Q. So, it is your testimony today to a reasonable degree of medical certainty that Mrs. Cameron is and has been in a persistent vegetative state?
"A. Yes."
On cross-examination, Dr. MacRae further testified:
 "Q. All right. Now, under persistent vegetative state, it says the following things are absent: Thought. Can you state that this woman can't think, and how can you tell that?
 "A. Well, to a reasonable degree of medical certainty, I don't believe that she can think. I see no evidence of any meaningful thought processes.
"Q. But there's no evidence that she can't think, is there?
 "A. Well, yes, I think that there is significant evidence that she's had severe brain damage, both sides of her brain, and she can't think.
 "Q. All right. Now you state that for this state to continue, there must be sensation absent. How can you — What sensation is absent? She feels pain if pain were inflicted upon her; would she not?
 "A. I asked that question myself last night, and looked it up in several dictionaries to find a meaning for sensation, and it turns out that sensation is a quite variable word. I believe that the framers of [Mrs. Cameron's living will] meant that an individual could not have a meaningful response to a sensation. . . . So, in the context of that document, I don't believe that that's the type of sensation that they meant.
 "Q. All right. Now, our next statement, awareness of self. You feel that she is completely unaware of who she is, where she is, what's going on?
"A. I feel that quite strongly.
 "Q. What about awareness of her environment; that is, do you feel that she is unaware when her children are present?
"A. I do.
"Q. You don't think she recognizes her children?
"A. I do not.
 "Q. But have you ever been there when the children arrived and seen her greet them?
"A. I have been there when the children arrived."
The Knights offered as a witness Dr. David McCraney, a neurologist who had performed a 45-minute examination of Mrs. Cameron on the evening before he testified. Dr. McCraney testified:
 "Q. What about self-awareness? In the living will, that term is used. Is *Page 95 
there any degree of self-awareness in this patient?
". . . .
 "A. There is some evidence that the patient has awareness. If we define self-awareness as the ability to perceive sensations that are going on in her own body, during the time that I visited her, I detected one behavior that suggested evidence of awareness. This happened when a nursing aide came in to swab the woman's mouth with a glycerin swab. And while she was swabbing the patient's mouth, at first she clamped her teeth down, and then she sucked on the swab. I could argue that both of those movements could have been reflexive movements.
 "However, after a moment of stimulation, the patient opened her mouth, and the only way I can interpret that is as a willful or on purpose movement. That would imply awareness of what was going on in her mouth at the time.
 "Q. So, you say there is some self-awareness in this patient?
 "A. I previously opined that self-awareness and awareness of the environment have scientifically the same basis, and so I'm going to answer that as evidence of generic awareness on a scientific basis.
 "Q. Now, can you — You've already defined persistent vegetative state, but can you tell from the records and from your visit with the patient if there is absolutely absent in this patient thought?
 "A. I cannot establish that the patient lacks any evidence of thought.
"Q. Does that require a negative opinion?
 "A. Well, yes, that's the whole problem with establishing that a person is in a vegetative state. . . .
 "In order to establish that a person is vegetative, I have to show that they have absolutely no ability to think whatsoever. That requires proving a negative. . . . In this case, I don't think we can establish with a high degree of certainty whether she's capable of introspective thought, but I would argue that just based on my observation alone, she did have one movement that suggested at least a degree of awareness, and, thus, I couldn't say that she was totally without thought or in a vegetative state.
 "Q. Now you've already stated that awareness of self and awareness of environment was indicated, among other things, by this brushing of the teeth or cleansing of her mouth or whatever the nurse was doing.
"A. Yes.
 "Q. So, if in this particular patient, the patient opens [her] eyes and tracks around the room a family member or some other person, what would that indicate?
"A. Tracking also implies a sense of awareness.
 "Q. Now, in your medical opinion, after making these examinations of the record and visiting with the patient, can you state to a medical certainty that she is or is not in a persistive vegetative state?
 "A. It's my opinion that she is not in a persistent vegetative state within a reasonable degree of medical certainty. She's —
 "Q. And that's based on the items you've already stated this morning?
 "A. That's correct. She's severely impaired, but not vegetative."
Following Dr. McCraney's testimony, Dr. Lacour testified as follows:
 "Q. Have you had the occasion to read the transcript of Dr. David McCraney, who testified in this court? *Page 96 
"A. Yes.
 "Q. And in his testimony, he points to one particular response that he says he observed which led him to the conclusion that she was not in a persistent vegetative state, that being the opening of her mouth. Can you address that and tell us how that comports with your diagnosis?
 "A. In the persistent vegetative state, individuals are allowed to demonstrate reflexive movement or stereotypic movements which are non-voluntary and part of the definition of the persistent vegetative state. And there's — easily that sort of response that he noted could be reflexive, no question.
"Q. The opening of her mouth to stimulation?
 "A. Just like a flinching maneuver — a flinching facial expression to a loud noise or a painful stimulation, all of those things can occur at a subcortical level just from a reflex. They do not imply that there's any cortical activity or recognition of the significance of those sensations or, you know, experiences whatsoever. One does not have to be conscious to do that.
 "If you take, for instance an anesthetized patient, they still have knee jerks, but they're not conscious. That all occurs at a subcortical level."
The Knights and other members of Mrs. Cameron's family testified that during their visits to Mrs. Cameron, she appeared to recognize them; this recognition, they said, was shown by Mrs. Cameron's blinking and visually following their movements about her room.
The trial court received considerable evidence that Mrs. Cameron knowingly executed a living will in 1995. The Knights did not present any evidence indicating that Mrs. Cameron's living will was invalid or that it was otherwise legally ineffective.
On December 6, 2000, the trial court entered an order that stated, in pertinent part:
 "The Plaintiffs have presented no credible evidence to the Court of undue influence, incompetence, fraud in the execution, or of any technical defect in the contents or execution of the `living will' executed on February 20, 1995.
 "Thus, the remaining issue for the Court to determine is whether Mrs. Cameron is in a `permanent unconscious state' and `persistent vegetative state' as these terms are used and defined in the instrument itself and the Code of Alabama.
 "The Court is acutely aware of the belief of the Plaintiffs, and other family members, that Mrs. Cameron retains some cognitive functions and displays recognition of some family members and is sympathetic with their desire to maintain her life. However, the Court, having considered the testimony of the physicians and all the other testimony and evidence, is satisfied by substantial evidence that Mrs. Cameron is in a `persistent vegetative state' and `permanent unconscious state' as those terms are used and defined in the `living will' and the Code of Alabama § 22-8A-3(10). Thus, the Court must enforce the desire and directives of Mrs. Cameron as set forth in her living will.
 "It is therefore, ORDERED, ADJUDGED, AND DECREED by the Court that the defendant shall cease providing artificial hydration and nutrition to Mrs. Cameron. . . ."
In this appeal, the Knights argue that the trial court erred in denying their petition to enjoin the removal of their mother's feeding tube because, they say, the court made two erroneous findings: (1) that Mrs. Cameron truly understood when she *Page 97 
executed her living will that she would be removed from life-sustaining treatment in her current condition; and (2) that Mrs. Cameron is in a "persistive vegetative state," as defined in her living will, or in a "permanent unconscious state," as that term is defined at § 22-8A-3(10), Ala. Code 1975, a part of Alabama's Natural Death Act, §§ 22-8A-1 to -13.[3]
In regard to their argument challenging the trial court's determination that Mrs. Cameron is in a persistent vegetative state, the Knights argue that the trial court used an incorrect evidentiary standard, i.e., that its finding was based on substantial evidence. They argue that because the finding that Mrs. Cameron was in a persistent vegetative state was a prerequisite to effectuating the terms of her living will and, under the circumstances of this case, to ordering the removal of the feeding tube, the trial court should have applied a higher evidentiary standard. The Knights argue that this Court should require that when a trial court's findings are the basis for an order that would implement the terms of a living will, those findings be supported by clear and convincing evidence. In addition, they argue that the trial court erred by affirmatively ordering that Mrs. Cameron's feeding tube be removed because, they say, the only issue presented to the trial court by the pleadings was whether the removal of the feeding tube should be enjoined.
The trial court heard conflicting testimony and took evidence during five separate hearings on the Knights' petition. Furthermore, the trial judge visited Mrs. Cameron during the course of the hearings. The record contains the following:
 "THE COURT: We're in Room 310 in Bay Manor Health Care facility in the room of Mrs. Delores Cameron. She appears to be able to turn her head and rotate the head. No audible response.
 "Mrs. Cameron, can you hear me now? Can you hear me on this side?
"(No audible response.)
 "I went from one side of the bed, from her right side to her left side, and there was no eye following movement.
 "Physically she looks to be in good condition. Mrs. Cameron, can you hear me?
"(No audible response.)"
The judgment appealed from is therefore based upon ore tenus evidence. Our standard of review of such judgments is settled:
 "[U]nder the ore tenus standard of review, the trial court's findings of fact based on oral testimony, and a judgment based on those findings, are given a presumption of correctness. A judgment based on such findings will not be reversed unless it is shown to be plainly and palpably wrong. The appellate courts are not allowed to substitute their own judgment for that of the trial court if the trial court's decision is supported by reasonable inferences to be drawn from the evidence. The reason for giving such deference to the trial judge's findings based on disputed evidence in ore tenus proceedings is that the trial judge has the benefit of observing the *Page 98 
 witnesses' manner and demeanor and has the better opportunity to pass upon the credibility of their testimony."
Ex parte Pielach, 681 So.2d 154, 154-55 (Ala. 1996) (citations omitted). Moreover, where the trial court does not make specific factual findings, this court will assume that the trial court made such findings as would support its judgment. Transamerica Commercial Fin. Corp. v. AmSouthBank, 608 So.2d 375, 378 (Ala. 1992).
 I. Did Mrs. Cameron truly understand the terms of her living willrelating to the removal of a feeding tube?
The Knights argue that their mother did not truly understand that her living will provided that a feeding tube would be removed if she were in the condition she is in currently. In pertinent part, Mrs. Cameron's living will states:
 "Declaration made this the 20th day of February, 1995. I, DELORES S. CAMERON[,] being of sound mind, willfully and voluntarily making known my desires that my dying shall not [be] artificially prolonged under the circumstances set forth below, do hereby declare:
"I. TERMINAL CONDITION
 "If, at any time my attending physician determines that I am unable to direct my care and I should have an incurable injury, disease, or illness certified to be a terminal condition by two attending physicians who have personally examined me, one of whom shall be my attending physician, and the physicians have determined that my death will occur whether or not life-sustaining procedures are utilized and where the application of life-sustaining procedures would serve only to artificially prolong the dying process, I direct that such procedures be withheld or withdrawn, and that I be permitted to die naturally with only the administration of medication or the performance of any medical procedure deemed necessary to provide me with comfort care [sic].
"II. MY OTHER SPECIFIC DIRECTIONS
 "My other specific directions are as follows (initial only those provisions you want applied):
". . . .
 "2. Persistive Vegetative State. If in the judgment of my attending physician, I am in a condition of persistive vegetative state:
 "(a) My wishes with respect to life-sustaining treatment [are] as indicated by my initials (initial only one).
 "/s/ D.S.C. (1) I do NOT want life-sustaining treatment that would only maintain me in a condition me [sic] in a persistive vegetative state without curing me.
". . . .
 "(b) My wishes with respect to artificially provided nutrition and hydration are as indicated by my initials (initial only one).
 "/s/ D.S.C. (1) I do NOT want artificially provided nutrition and hydration provided to me even if withholding or withdrawing it causes me pain.
". . . .
"III. DEFINITIONS
 "For the purposes of this Declaration[,] the following terms shall have the meanings ascribed to them:
 "1. Life-Sustaining Procedures. Any medical treatment, procedure, or intervention that, in the judgment of the attending physician, when applied to me, would serve only to prolong the dying *Page 99 
 process. These procedures shall include, but are not limited to, assisted ventilation, renal dialysis, surgical procedures, blood transfusions, and the administration of drugs and antibiotics. Life-sustaining treatment shall not include the administration of medication or the performance of any medical treatment where, in the opinion of the attending physician, the medication or treatment is necessary to provide comfort or to alleviate pain.
 "2. Artificially Provided Nutrition and Hydration. The supplying of food and water through a conduit, such as a tube or intravenous line, where the recipient is not required to chew or swallow voluntarily, including, but not limited to, nasogastric tubes, gastrostomies, jejunostomies, and intravenous infusions. Artificially provided nutrition and hydration does not include assisted feeding, such as spoon or bottle feeding.
 "3. Attending Physician. The physician selected by, or assigned to, me and who has primary responsibility for my treatment and care.
 "4. Terminal Condition or Injury. An illness or injury for which there is no reasonable prospect of cure or recovery, death is imminent, and the application of life-sustaining procedure[s] would only prolong the dying process.
 "5. Persistive Vegetative State. A condition, to a reasonable degree of medical certainty:
 "(a) Which will last permanently, without improvement;
 "(b) In which thought, sensation, purposeful action, social interaction, and awareness of self and environment are absent; and
 "(c) Which has existed for 30 days since diagnosis as [a] persistent vegetative state.
"IV. APPLICABILITY
 "In the absence of my ability to give directions regarding the use of such life-sustaining procedures and artificially provided nutrition and hydration, it is my intention that this Declaration shall be honored by my family and physician(s) as the final expression of my legal right to refuse medical or surgical treatment and accept the consequences from such refusal.
". . . .
 "I understand the full import of this Declaration and I am emotionally and mentally competent to make this Declaration.
 "I understand that I may revoke this Declaration at any time.
"Dated this the 20th day of February, 1995.
"/s/ Delores S. Cameron
"DELORES S. CAMERON"
The Knights have presented no evidence tending to show that the trial court's finding that Mrs. Cameron's living will was legally effective was plainly or palpably wrong. We conclude that there is sufficient evidence in the record supporting the trial court's finding that Mrs. Cameron's living will was valid.[4] *Page 100 
 II. Is the trial court's finding that Mrs. Cameron is in a persistentvegetative state supported by clear and convincing evidence?
The Knights further argue that the trial court applied the wrong evidentiary standard in stating that it "was satisfied by substantial evidence" that Mrs. Cameron was in a persistent vegetative state. We infer that the trial court, by using this language, was merely stating that there was sufficient evidence to support its finding as the trier of fact, rather than stating the evidentiary standard it used.[5] We find nothing in the applicable statutes or in the caselaw of this State addressing this issue. Accordingly, because this is an issue of first impression, we consider the decisions of other jurisdictions. The Supreme Court of Arizona in Rasmussen v. Fleming, 154 Ariz. 207, 224, 741 P.2d 674,691 (1987), held:
 "If the court is requested to resolve disputes among interested parties, particularly disputes questioning the `substituted judgment' or the `best interests' of the incompetent patient, then evidence necessary to resolve the dispute must be `clear and convincing.' Although the typical evidentiary standard in civil cases is `by a preponderance of the evidence,' we have recognized the need for a higher standard in exceptional civil matters. We deal here with matters that in at least some instances raise life-or-death issues and in all instances involve personal interests more important than those found in the typical civil dispute where private litigants squabble over a sum of money. We hold that court-resolved disputes in cases of this nature must be resolved by clear and convincing evidence."
(Citations omitted.)
The Supreme Court of Maine in In re Gardner, 534 A.2d 947, 953 (Me. 1987), stated:
 "The Superior Court properly applied a `clear and convincing' standard of proof to establish both that Gardner is *Page 101 
 in an irreversible and persistent vegetative state and that he had declared in advance of his injury his intent and desire not to receive life-sustaining care if he ever came into a persistent vegetative state."
(Footnote omitted.) The Supreme Court of the United States in Cruzan v.Director, Missouri Dep't of Health, 497 U.S. 261 (1990), held that the states could require clear and convincing evidence as the standard for proving a person's intent not to receive life-sustaining treatments, and several states have required clear and convincing evidence in a variety of situations involving the removal of life-support systems and artificially provided hydration and nutrition. See, In re Christopher,177 Misc.2d 352, 675 N.Y.S.2d 807 (N.Y.Sup.Ct. 1998); Blackman v. NewYork City Health Hosps. Corp., 173 Misc.2d 562, 660 N.Y.S.2d 643
(N.Y.Sup.Ct. 1997); In re Martin, 450 Mich. 204, 538 N.W.2d 399 (1995);In re Tavel, 661 A.2d 1061 (Del. 1995); In re Application of Barsky,165 Misc.2d 175, 627 N.Y.S.2d 903 (N.Y.Sup.Ct. 1995); Mack v. Mack,329 Md. 188, 618 A.2d 744 (1993); In re Guardianship of L.W.,167 Wis.2d 53, 94, 482 N.W.2d 60, 76 (1992) (Ceci, J., concurring) ("The diagnosis of persistent vegetative state must be by evidence which is clear and convincing. We are, after all, dealing with the death of a human being."); In re Moorhouse, 250 N.J. Super. 307, 593 A.2d 1256
(1991); Curran v. Bosze, 141 Ill.2d 473, 566 N.E.2d 1319, 153 Ill. Dec. 213 (1990); In re Guardianship of Browning, 568 So.2d 4 (Fla. 1990);McConnell v. Beverly Enterprises-Connecticut, 209 Conn. 692, 553 A.2d 596
(1989); Elbaum by Elbaum v. Grace Plaza of Great Neck, Inc.,148 A.D.2d 244, 544 N.Y.S.2d 840 (1989); In re Beth Israel Med. Ctr.,136 Misc.2d 931, 519 N.Y.S.2d 511 (N.Y.Sup.Ct. 1987); In re Jobes,108 N.J. 394, 529 A.2d 434 (1987); Workmen's Circle Home Infirmary forthe Aged v. Fink, 135 Misc.2d 270, 514 N.Y.S.2d 893 (N.Y.Sup.Ct. 1987);John F. Kennedy Mem'l Hosp., Inc. v. Bludworth, 452 So.2d 921 (Fla. 1984); In re Storar, 52 N.Y.2d 363, 420 N.E.2d 64, 438 N.Y.S.2d 266
(1981); and Leach v. Akron Gen. Med. Ctr., 168 Ohio Misc. 1,426 N.E.2d 809, 815 (1980).
We note that our Legislature in § 6-11-20(b)(4), Ala. Code 1975, has required that an award of punitive damages must be supported by clear and convincing evidence. That section defines clear and convincing evidence as:
 "Evidence that, when weighed against evidence in opposition, will produce in the mind of the trier of fact a firm conviction as to each essential element of the claim and a high probability as to the correctness of the conclusion. Proof by clear and convincing evidence requires a level of proof greater than a preponderance of the evidence or the substantial weight of the evidence, but less than beyond a reasonable doubt."[6]
We conclude that the rationale used by the Arizona Supreme Court inRasmussen is applicable in the instant situation. Determining whether Mrs. Cameron is in a persistent vegetative state in the context of this case is a determination of the type that requires greater certainty than the usual factual determination. After considering the large body of authority from other jurisdictions, we conclude that any finding that Mrs. Cameron is in a persistent *Page 102 
vegetative state must be supported by clear and convincing evidence.
After reviewing the evidence presented to the trial court, we conclude that the record contains clear and convincing evidence to support the trial court's finding that Mrs. Cameron is in a persistent vegetative state. However, the law is settled that weighing evidence is not the usual function of an appellate court. Thompson v. Citmoco Servs., Inc.,371 So.2d 42 (Ala. 1978). This is especially true where, as here, the assessment of the credibility of witnesses is involved. The ore tenus rule reflects this deference; it accords a presumption of correctness to the trial court's findings because of that court's unique ability to observe the demeanor of witnesses. Pielach, supra; Hall v. Mazzone,486 So.2d 408 (Ala. 1986). Thus, although the record is sufficiently complete to obviate the need for any further evidentiary hearing, we conclude that it is appropriate to remand this cause to the trial court for its explicit finding as to whether there is clear and convincing evidence indicating that Mrs. Cameron is in a persistent vegetative state. Further, because we request only that the trial court apply the clear-and-convincing standard to the evidence it has already received and evaluated, we instruct that the trial court return its order on remand to this Court within 14 days.
III. Did the trial court exceed the requested relief when it ordered theremoval of the feeding tube?
The Knights lastly contend that the trial court erred by ordering that the feeding tube sustaining Mrs. Cameron be removed. They argue that they sought only to enjoin the implementation of Mrs. Cameron's living will and that the trial court exceeded the scope of their requested relief. However, the record indicates that Mr. Cameron filed a motion to intervene and that the trial court granted that motion. The Knights subsequently moved to have Mr. Cameron added as a defendant and the trial court also granted that motion. During the trial court's first hearing, Mr. Cameron testified as follows:
 "Q. Based upon your many years of being married to Delores and your discussions with her and with others concerning whether you would ever want to be sustained on life support, is it your opinion that Delores, if she could communicate with us now, would advise that she did not want to be kept —
 "A. She would say why are you doing this to me. Let me go and be with my Lord and Saviour is exactly what she would say.
 "Q. And are you here in this court today asking that the Judge respect [Mrs. Cameron's] wishes as set forth in her living will?
"A. Right. She has spelled it out."
By these statements, Mr. Cameron essentially requested the trial court to allow the implementation of Mrs. Cameron's living will. Opposing counsel made no objection to his request. Rule 15(b), Ala.R.Civ.P., which addresses amended and supplemental pleadings, states:
 "(b) Amendments to Conform to the Evidence. When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure so to amend does not affect the result of the trial of these issues. If evidence is objected to at the trial on the ground that it is not within the issues *Page 103 
 made by the pleadings, the court may allow the pleadings to be amended and shall do so freely when the presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that the admission of such evidence would prejudice the party in maintaining the party's action or defense upon the merits. The court may grant a continuance to enable the objecting party to meet such evidence. An amendment shall not be refused under subdivision (a) and (b) of this rule solely because it adds a claim or defense, changes a claim or defense, or works a complete change in parties. The Court is to be liberal in granting permission to amend when justice so requires."
In applying Rule 15(b) to a similar procedural situation, this Court stated:
 "United Companies and Seale counter with the argument that the complaint's allegation of fraud did not include the aspect testified to by Mrs. Holcombe. However, no objection was made to Mrs. Holcombe's testimony, so the complaint may be deemed amended by consent, Rule 15(b), Ala.R.Civ.P., and [the] trial court did not err in submitting the fraud claim to the jury."
United Cos. Fin. Corp. v. Brown, 584 So.2d 470, 473 (Ala. 1991). Likewise, in this case, once Mr. Cameron requested the trial court to respect Mrs. Cameron's wishes as expressed in her living will, and because the Knights' counsel made no objection, the trial court properly considered Mr. Cameron's request and granted the relief requested.
In summary, we affirm the judgment of the trial court insofar as it determined that Mrs. Cameron had a valid living will; insofar as it implicitly determined that she understood the contents of that living will; and insofar as it determined that it could properly grant the relief Mr. Cameron requested. We remand the case for the trial court to enter an order stating whether its finding that Mrs. Cameron is in a "persistent vegetative state," as defined in her living will, or in a "permanent unconscious state," as defined in § 22-8A-3(10), was supported by clear and convincing evidence. The trial court is further instructed to make its return to this Court within 14 days.
AFFIRMED IN PART AND REMANDED.
Moore, C.J., and See, Brown, and Stuart, JJ., concur.
On August 31, 2001, this Court remanded this case to the trial court for an explicit determination as to whether its finding that Delores Cameron was in a "persistent vegatative state," as defined in her living will, or in a "permanent unconscious state," as defined in Ala. Code 1975 § 22-8A-3(10), was supported by clear and convincing evidence. The trial court has filed its return, stating that its finding was supported by clear and convincing evidence. We likewise find that degree of support in the record. Accordingly, the judgment of the trial court is affirmed.
Houston, See, Lyons, Brown, Johnstone, Woodall, and Strart, J.J., concur.
[1] While the style in all the pleadings and materials below refer to this defendant as "Beverly Health Care Bay Manor Health Care Center," the defendant's counsel, in his notice of appearance, stated that the defendant's correct name was "South Alabama Nursing Home, Inc., d/b/a Beverly Healthcare-Mobile." Although it is not clear from the materials before us, it appears that the defendant owns or operates the Bay Manor nursing-home facility, where the Knights' mother resides.
[2] Mr. Cameron is the Knights' stepfather.
[3] Mrs. Cameron's living will was drafted in 1995, before the 1997 amendments to the Natural Death Act. Those amendments added and defined the term "permanent unconsciousness" and included the state of permanent unconsciousness as a diagnosed condition that will allow the implementation of a living will. Dr. MacRae testified that, to a reasonable degree of medical certainty, Mrs. Cameron's condition fit both the definition of "persistent vegetative state," as that term is used in her living will, and the definition of "permanent unconsciousness," as that term is used in the Natural Death Act, and that those terms were "one in the same."
[4] While the trial court did not specifically state an evidentiary standard for its finding that Mrs. Cameron had a valid living will, we note that other jurisdictions have determined that the existence of a valid living will is, in and of itself, clear and convincing evidence of an intent to terminate life-sustaining treatments and artificially provided hydration and nutrition. In John F. Kennedy Mem'l Hosp., Inc. v.Bludworth, 452 So.2d 921, 926 (Fla. 1984), the Florida Supreme Court held:
 "If [a terminally ill incompetent person], while competent, had executed a so-called `living' or `mercy' will, that will would be persuasive evidence of that incompetent person's intention and it should be given great weight by the person or persons who substitute their judgment on behalf of the terminally ill incompetent."
Also, in In re Guardianship of Browning, 568 So.2d 4, 16 (Fla. 1990), the Florida Supreme Court determined:
 "Although a surrogate may rely on oral statements made by the incompetent, while competent, to exercise the incompetent's wishes to [forgo] life-sustaining treatment, the presumption of clear and convincing evidence that attaches to a written declaration does not attach to purely oral declarations."
Similarly, the New York Superior Court held in Saunders v. State,129 Misc.2d 45, 54-55, 492 N.Y.S.2d 510, 517 (N.Y.Sup.Ct. 1985):
 "The [living will] executed by the petitioner is evidence of the most persuasive quality and is a clear and convincing demonstration that while competent the petitioner clearly and explicitly expressed an informed, rational and knowing decision to decline certain medical treatment by artificial means and devices while in a terminally ill state or condition and it should be given great weight by the hospital authorities and treating physicians attending her."
See also, In re Martin, 450 Mich. 204, 538 N.W.2d 399 (1995).
[5] In Hines v. Riverside Chevrolet-Olds, Inc., 655 So.2d 909 (Ala. 1994) (overruled on other grounds, State Farm Fire Cas. Co. v. Owen,729 So.2d 834 (Ala. 1999)), this Court examined the interplay between § 12-21-12, Ala. Code 1975, which requires substantial evidence to submit an issue of fact to the trier of fact, and § 6-11-20(b)(4), Ala. Code 1975, which requires clear and convincing evidence for an award of punitive damages. This Court held that in order for a judge to submit the issue of punitive damages to the jury as the trier of fact, the judge must be satisfied by substantial evidence. Then, the jury must be satisfied that the plaintiff has presented clear and convincing evidence to support the punitive-damages award. See also, Ex parte Norwood HodgesMotor Co., 680 So.2d 245 (Ala. 1996).
[6] This definition is also used in § 25-5-81(c), Ala. Code 1975, a provision of Alabama's Workers' Compensation Act, with regard to the evidentiary standard to be applied in cases that involve injuries arising from gradual deterioration or cumulative physical stress disorders. *Page 104