In November 1994, Michael L. Caddell sued Liberty National Life Insurance Company, alleging a breach of contract, conversion, and fraud and requesting compensatory and punitive damages. The trial court dismissed the breach of contract and fraud claims; only the conversion claim was presented to the jury. Liberty National filed motions for a directed verdict at the close of Caddell's evidence and at the close of its own evidence, both of which the trial court denied. The jury returned a verdict for Caddell and awarded him $50,000 in compensatory damages and $100,000 in punitive damages. Liberty National moved for a JNOV, or, in the alternative, for a new trial or remittitur. The trial court denied Liberty National's motion for JNOV; the motion for new trial or remittitur was denied by operation of law, pursuant to Rule 59.1, Ala. R. Civ. P. Liberty National appealed to the supreme court; the appeal was transferred to this court, pursuant to § 12-2-7(6), Ala. Code 1975.
Liberty National argues on appeal: (1) that the trial court erred in submitting the conversion claim to the jury, i.e., that the court erred in denying its motions for a directed verdict and a JNOV; (2) that the amount of compensatory damages is not supported by the evidence; (3) that the court erred in submitting the issue of punitive damages to the jury; and (4) that the court erred in admitting certain evidence.
In 1989, Caddell purchased from Liberty National a life insurance policy with an annuity rider. At the time of the purchase, Caddell arranged for the premiums to be paid by electronic funds transfer or "bank draft" directly from his bank account. The monthly policy and annuity rider premium was $80.65. Caddell testified that a Liberty National agent told him that he could cash in the policy and annuity rider at any time.
Caddell decided to cash in the policy and annuity rider in January 1994. He notified the Liberty National office in Eufaula that he wished to cash in the policy. Thomas Rotton, a Liberty National agent, was sent to Caddell's home. Caddell testified that Rotton told him that he would have the bank *Page 1134 
drafts on Caddell's bank account stopped. Caddell stated that Rotton said he was not sure if he had the proper forms to cash in the policy, but that if they were not the right forms, he would return with more forms in two weeks. Rotton, in fact, did not have the proper forms; he returned on March 4, 1994, with the correct forms, which Caddell then completed. Caddell testified that Rotton again told him that he would have the bank drafts stopped and that the forms completed at this meeting were all Caddell needed in order to cash in his policy. Caddell never heard from or saw Rotton again.
In March 1994, Caddell received a $2,158.06 check from Liberty National representing the cash value of the annuity portion of the policy. Upon receipt of this check, Caddell telephoned the Liberty National office in Eufaula to inquire about the balance of his funds. Caddell stated that he was told he would receive the balance of his funds in a couple of weeks. Caddell's March 8, 1994, bank statement indicates that $80.65 was drafted from his account.
In April 1994, $45.65 was drafted from Caddell's bank account. He called the Liberty National office to ask why Liberty National was still drafting his account. He stated that he was told by a Liberty National representative that Liberty National would "look into it" and that "it would be taken care of." Caddell's June 7, 1994, bank statement indicates that $45.65 was drafted from his account twice during the month of June. Caddell again contacted Liberty National and, again, was told that Liberty National would "look into it." Caddell's wife attempted to have the bank drafts stopped in March 1994, by completing a "stop payment" form at the bank; however, this attempt failed. It was not until after she had contacted the bank in June 1994, after receiving the bank statement, and asked that the bank drafts be stopped that the drafts on Caddell's account were stopped.
Between January and June 1994, all contact with Liberty National had been initiated by Caddell; Liberty National had never contacted Caddell about the problems with the bank drafts. Caddell contacted his attorney in June 1994. That same month, he received a cash surrender request form from Liberty National, which he turned over to his attorney. In September 1994, Caddell received from Liberty National an "automatic loan receipt" indicating that it had deducted $84.52 from the cash value of his policy. In November 1994, Caddell received from Liberty National another "automatic loan receipt" indicating that it had deducted $592.79 from the cash value of the policy. In November 1995, one year after Caddell had filed his lawsuit, he received the balance of the cash value from his policy.
Liberty National first argues that the court erred in denying its motion for a directed verdict and submitting the conversion claim to the jury and then in denying its motion for a JNOV. A motion for a directed verdict or a JNOV is due to be granted when the nonmoving party has failed to present substantial evidence to support his or her position. §12-21-12, Ala. Code 1975; John R. Cowley Brothers, Inc. v.Brown, 569 So.2d 375 (Ala. 1990). Substantial evidence is "evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved." West v. FoundersLife Assurance Co. of Florida, 547 So.2d 870, 871 (Ala. 1989). This court, when reviewing the denial of a directed verdict or a JNOV, applies the same standard the trial court applies when it considers a motion for a directed verdict or a JNOV. John R.Cowley Brothers, supra. The ultimate question regarding either motion is whether the nonmovant has presented substantial evidence supporting each element of his claim.Carter v. Henderson, 598 So.2d 1350 (Ala. 1992). In reviewing directed verdict and JNOV motions, we must review all the evidence in a light most favorable to the nonmovant and must consider such reasonable evidentiary inferences as the jury would be free to draw. Id. Our supreme court has held:
 To constitute conversion, there must be a wrongful taking, an illegal assumption of ownership, or an illegal use or misuse of another's property. Gillis v. Benefit Trust Life Ins. Co., 601 So.2d 951 (Ala. 1992). An action alleging conversion of cash lies only where the money involved is 'earmarked' *Page 1135 
or is specific money capable of identification. . . . In Gillis, this Court determined that money received by use of pre-authorized checks drawn monthly by an insurer against the insured's checking account to cover premiums for a specific insurance policy is 'identifiable' for purposes of maintaining a claim for conversion."
Gray v. Liberty National Life Ins. Co., 623 So.2d 1156, 1160
(Ala. 1993).
We conclude that the trial court properly submitted the conversion claim to the jury. After purchasing in 1989 the life insurance policy with an annuity rider, Caddell sought to cash in the policy in January 1994. An agent brought forms for surrender of the policy, but he was unsure whether he had the correct forms. In March 1994, the agent returned with new forms. Liberty National contends that Caddell returned only the surrender form for the annuity rider and that it, therefore, continued to deduct monthly premiums for the life insurance portion of the policy. Caddell contends that he returned both forms necessary to cash in his policy and that Liberty National wrongfully deducted any premium after the date he contends that he returned the forms. Based upon the conflicting evidence, we conclude that the trial court properly submitted the conversion claim to the jury.
Liberty National next argues that the jury awarded excessive compensatory damages. A jury's verdict is presumed correct and will not be disturbed on appeal unless it is plainly erroneous or manifestly unjust. Crown Life Ins. Co. v.Smith, 657 So.2d 821 (Ala. 1994). Additionally, " 'A strong presumption of correctness attaches to a jury verdict in Alabama, if the verdict passes the "sufficiency test" presented by motions for directed verdict and JNOV. This presumption of correctness is further strengthened by a trial court's denial of a motion for new trial.' " Wal-Mart Stores, Inc. v. Tuck,671 So.2d 101, 105 (Ala.Civ.App. 1995), quoting City of GulfShores v. Harbert Int'l, 608 So.2d 348, 356 (Ala. 1992) (citations omitted). "Because the jury returned a verdict for [the plaintiff], any disputed questions of fact must be resolved in [his] favor, and we must presume that the jury drew from the facts any reasonable inferences necessary to support its verdict." Crown Life Ins. Co., supra, at 822. In reviewing a judgment based on a jury verdict, this court must review the record in a light most favorable to the appellee.Id.
Liberty National contends that compensatory damages should not have been awarded, because, it says, it returned the premiums, plus interest, that had been deducted from Caddell's bank account after Caddell had requested the cancellation of the insurance policy. Caddell concedes that he did eventually receive the wrongfully deducted premiums and interest. Our supreme court has held that the "recovery of the [converted] property by the plaintiff does not bar a suit for conversion but merely reduces the plaintiff's damages by the value of the property at the time of its return." Brown v. Campbell, 536 So.2d 920, 922 (Ala. 1988).
The jury awarded Caddell $50,000 in compensatory damages. The trial court instructed the jury, without objection from Liberty National, that the compensatory damages would be limited to damages for mental anguish because Liberty National had returned to Caddell the deducted premiums plus the required interest. Liberty National does not argue that mental anguish is not recoverable in a conversion action or that Caddell suffered no mental anguish; rather, it argues only that the $50,000 award for Caddell's mental anguish is excessive. Caddell testified as to his mental anguish as follows:
 "Q. In March [1994] when you got the bank statement that showed the money coming out of your account how did you feel about that?
"A. I was mad.
"Q. Why were you mad?
 "A. Because Thomas Rotton said Liberty National was going to take care of it.
 "Q. In the subsequent months when you got the notices that they had been taking money out of your account —
"A. I got madder and madder every month.
"Q. Why was that?
"A. Because it was aggravating. *Page 1136 
 "Q. Did you have conversations with your wife about that?
"A. Yes.
"Q. What was her attitude about it?
 "A. She didn't like it. She couldn't keep the books straight.
 "Q. Did it cause arguments between you and your wife?
"A. Yes, it did.
". . . .
 "Q. What was the subject of your arguments with your wife as related to this money coming out of your account?
 "A. It was because Liberty National was taking money out of our checking account every month.
 "Q. Did it make it hard for her to plan the family budget?
"A. That's right.
"Q. Is that why she was upset?
"A. That is correct."
Our supreme court has held:
 " 'When assessing the question of excessiveness of compensatory damages, the focus is on the Plaintiff, as stated in Pitt v. Century II, Inc., 631 So.2d 235 (Ala. 1993):
 " ' "A court reviewing a verdict for compensatory damages must determine what amount a jury, in its discretion, may award, viewing the evidence from the plaintiff's perspective. Bridges v. Clements, 580 So.2d 1346, 1349
(Ala. 1991)."
 " 'There is no fixed standard for ascertainment of compensatory damages for mental anguish. A determination of how much to award is left to the sound discretion of the jury, subject only to the correction of the Court for clear abuse or passionate exercise. Alabama Power Co. v. Mosley, 294 Ala. 394, 318 So.2d 260 (1975).' "
Duck Head Apparel Co. v. Hoots, 659 So.2d 897, 907 (Ala. 1995). We conclude that the jury's verdict awarding Caddell $50,000 was within its discretion and was not the result of "clear abuse or passionate exercise." Id.
Liberty National next argues that the trial court erred in submitting the issue of punitive damages to the jury and that the evidence does not support an award of punitive damages. Section 6-11-20(a), Ala. Code 1975, states, in pertinent part:
 "(a) Punitive damages may not be awarded in any civil action . . . other than in a tort action where it is proven by clear and convincing evidence that the defendant consciously or deliberately engaged in oppression, fraud, wantonness, or malice with regard to the plaintiff."
The jury has discretion to award punitive damages after considering all attendant circumstances, subject to judicial review to ensure that the award is not the result of passion, bias, prejudice, corruption, or other improper motive.Schwertfeger v. Moorehouse, 569 So.2d 322 (Ala. 1990); Land Associates, Inc. v. Simmons, 562 So.2d 140 (Ala. 1989), cert.denied, 499 U.S. 918, 111 S.Ct. 1305, 113 L.Ed.2d 240 (1991). The purpose of a punitive damages award is to punish the wrongdoer and to prevent similar wrongs from being committed in the future. Derwinski v. Nichols, 671 So.2d 86
(Ala.Civ.App. 1995). An award of punitive damages is proper in a conversion case where the evidence shows legal malice, willfulness, insult, or other aggravating circumstances, or where the conversion is done in the known violation of the owner's rights. Id.; Citizens Bank of Moulton v. Jones,671 So.2d 737 (Ala.Civ.App. 1995).
Caddell presented evidence that Liberty National had wrongfully deducted premium payments from his bank account after he was told that he had completed the forms necessary to cash in the policy and annuity rider. The evidence indicated that after each draft on his account Caddell contacted Liberty National and that each time he was told that Liberty National would "look into it" and that "it would be taken care of." Caddell also presented evidence that Liberty National did not correct its error and that he did not receive a refund of those payments and interest until he had hired an attorney and filed a lawsuit.
The former Liberty National agent who sold Caddell the policy in question testified that it is "no trouble at all" to cash in a policy and that it is the responsibility of the agent *Page 1137 
to see that all the necessary paperwork is completed. The agent further stated that the entire process of cashing in a policy and receiving its value should have taken 10 days to 2 weeks. Additionally, the agent testified that when a customer cashes in a policy, Liberty National and its agents lose money and that no one at the company "wants to see a policy cashed in." Finally, the agent testified that while he was employed at Liberty National he experienced resistance from sales management when he attempted to cash in policies on behalf of customers.
After carefully reviewing the record, with the applicable legal principles in mind, we conclude that the plaintiff presented sufficient legal evidence to allow a jury to consider the issue of punitive damages. We further conclude that the jury could have inferred from the evidence that the conversion was done willfully, in known violation of Caddell's rights; therefore, the $100,000 punitive damages award is supported by the evidence.
Finally, Liberty National argues that the trial court erred in admitting the testimony of Sharon Jackson, who testified that Liberty National had wrongfully delayed her cancellation of an insurance policy. Evidentiary matters are within the sound discretion of the trial court. Newman v. Bankers FidelityLife Ins. Co., 628 So.2d 439 (Ala. 1993). " 'Questions of materiality, relevancy, and remoteness of evidence are matters resting within the discretion of the trial court, whose exercise of that discretion will not be reversed unless it has been grossly abused.' " Id., at 442, quoting HealthAmerica v.Menton, 551 So.2d 235, 245 (Ala. 1989), cert. denied,493 U.S. 1093, 110 S.Ct. 1166, 107 L.Ed.2d 1069 (1990). We conclude that if the trial court did err in allowing Jackson to testify, its error was harmless, because there was ample legal evidence to support the jury's verdict in this case without Jackson's testimony. See Jack's Restaurant v. Turnbow, 674 So.2d 573
(Ala.Civ.App. 1995).
AFFIRMED.
ROBERTSON, P.J., and MONROE, J., concur.
CRAWLEY, J., concurs in part and dissents in part.
THOMPSON, J., dissents.