872 So.2d 819 (2003)
INDUSTRIAL TECHNOLOGIES, INC., and Richard Hill
v.
JACOBS BANK.
Jacobs Bank
v.
Industrial Technologies, Inc., and Richard Hill.
1011966 and 1012064.
Supreme Court of Alabama.
April 25, 2003.
Rehearing Denied August 29, 2003.
*820 Donald G. Madison, Montgomery; and William H. Webster of Webster & Henry, P.C., Montgomery, for appellants/cross-appellees Industrial Technologies, Inc., and Richard Hill.
John F. Porter III, Scottsboro, for appellee/cross-appellant Jacobs Bank.
WOODALL, Justice.
This case involves an appeal by Industrial Technologies, Inc., and Richard Hill, the owner and sole shareholder of that corporation (hereinafter referred to collectively as "Industrial"), and a cross-appeal by Jacobs Bank ("the Bank"), from a judgment entered on a jury verdict awarding Industrial $148,000 in compensatory damages, but vacating the jury's $250,000 punitive-damages award, in Industrial's counterclaims against the Bank for conversion of Industrial's manufacturing equipment. As to the appeal (case no. 1011966), we reverse and remand. As to the cross-appeal (case no. 1012064), we affirm.
This is the not the first time this Court has reviewed some aspect of this litigation. See Ex parte Indus. Techs., Inc., 707 So.2d 234 (Ala.1997).[1] The dispute arose out of a business relationship, formed in 1989, between Industrial and American Detention Products, Inc. ("ADPI"), a manufacturer of *821 "jail bars and prison equipment." At that time, ADPI was indebted to the Bank. In particular, ADPI had taken out a $200,000 loan secured by a promissory note, giving the Bank a security interest in "[a]ll machinery and equipment of [ADPI's] business whether [then] existing or [thereafter] acquired." The security interest was described in identical terms on a UCC financing statement, filed with the secretary of state on March 28, 1988. Filed with the financing statement was "Exhibit B," purporting to be an "Asset List" of equipment owned by ADPI.
Shortly after ADPI secured the loan, Industrial began transacting business with ADPI. More specifically, Industrial began making loans to ADPI in exchange for a security interest in ADPI's accounts receivable. Similarly, Industrial leased to ADPI, according to Hill, several items of manufacturing equipment, which, Hill states, Industrial had purchased with its own funds, for use by ADPI on ADPI's premises. In May 1992, ADPI ceased its business operations and vacated the premises.
On July 9, 1992, the Bank commenced an action against ADPI.[2] The complaint alleged that ADPI was "substantially in default, ... having failed to make the agreed monthly payments" on the loan. The complaint alleged that the Bank had a security interest in the equipment on the asset list filed with the UCC financing statement, and that the equipment was located on ADPI's premises. It sought, among other things, an order "giv[ing] the [Bank] the possession and title to said property."
By a letter dated July 13, 1992, counsel for Industrial corresponded with the Bank's counsel, stating, in part:
"If you recall, I called you concerning the interest of [Industrial] in certain equipment located on the premises which have been leased by [ADPI] in Scottsboro, Alabama, particularly in light of the fact that [the] Bank claims through various loans made to [ADPI], a majority of the equipment which has been utilized in [ADPI's] operations.
"I have enclosed a copy of a list of the equipment which belongs to [Industrial], which has been on lease to [ADPI], which equipment should not be attempted to be removed from the premises leased by [ADPI], during any removal of equipment by [the] Bank in removing equipment which [the] Bank alleges is secured through the various loans made to [ADPI]."
(Emphasis added.)
Ten days later, the trial court entered an order, stating that the Bank was entitled to possession of the equipment described on the asset list. It further authorized the Bank to take possession of the equipment in 30 days, if the debt of ADPI was not paid. The debt was not paid, and, in September 1992, the Bank took possession of all the equipment on the premises formerly occupied by ADPI. More specifically, the Bank leased the building housing the equipment and began liquidating the equipment.
In a letter to the Bank's counsel dated December 10, 1992, counsel for Industrial noted that Industrial had received no notice of the liquidation. The letter also stated: "Arrangements ... need to be made to allow [Industrial] and/or Richard Hill to obtain possession of the equipment owned by [Industrial] and Richard Hill." In a letter to Industrial's counsel dated March 2, 1993, counsel for the Bank stated, in pertinent part:

*822 "This will confirm that [the] Bank claims a security interest in all of the machinery and equipment and other miscellaneous items listed on the UCC-1 financing statements which I have previously provided, together with all additions, replacements, accessions and after acquired property. This includes virtually all of the property now located upon the former business premises of ADPI in Scottsboro, Alabama. As I explained to you last week, [the] Bank has negotiated a sale arrangement for this equipment where they are guaranteed the sum of $ 105,000.00, which includes all of the equipment now located on the premises formerly occupied by ADPI. However, with your client making a claim to a portion of this equipment, whether their claim is valid or not, [the] Bank cannot guarantee clear title to the ultimate purchasers. Without this guarantee or certification, I suspect the purchasers will withdraw their offer. If this offer is withdrawn and is not replaced by an offer of equal value, and it is ultimately determined that [the] Bank holds a priority security interest on all of the equipment which they are claiming, the Bank will look to [Industrial] and Richard Hill for all consequential damages because of their interference with the Bank's rightful foreclosure of their security interest."
(Emphasis added.)
On March 17 and 18, 1993, Industrial's counsel sent the Bank a letter and copies of numerous bills of sale and invoices from various companies, evidencing the purchase by Industrial of equipment, which Industrial specifically identified as its equipment being housed on the former premises of ADPI. The March 17 letter further stated:
"You stated in previous correspondence that once documentation had been provided to you evidencing title of the disputed equipment in my client, that you would immediately release said equipment to my client's care and allow him to pick the same up. Demand is hereby made that the equipment ... (reflected on the attached exhibits) be immediately released. Any further attempt by [the] Bank to attempt to claim the equipment ... is frivolous and without merit. [The] Bank is totally without argument to deny my client immediate possession of said equipment."
(Emphasis added.)
Additionally, Hill, accompanied by counsel, traveled to Scottsboro to meet personally with the Bank's counsel regarding the documentation provided by the correspondence of March 17 and 18. At that meeting, Hill requested permission to retrieve the equipment. In response, according to Hill's unrefuted testimony, counsel for the Bank told him "not to go out there [or] he was going to put him in jail for fraud."
Subsequently, on May 7, 1993, the Bank amended its complaint to include a claim against Industrial and Hill, individually. The amended complaint sought a judgment declaring the Bank's "security interest... to be superior to the claims of the defendants in and to the equipment located upon the premises formerly occupied by [ADPI], and authorizing it to proceed with the sale in a commercially reasonable manner." Industrial answered the amended complaint, and counterclaimed against the Bank, alleging conversion. The counterclaim sought $300,000 in compensatory damages, and $3,000,000 in punitive damages.
Throughout succeeding years, while this action was pending, Hill periodically visited the premises to keep apprised of the condition of the disputed equipment. In December 1993, Hill visited the premises, accompanied by James Hines, a loan officer *823 of the Bank. At that time, Hill found the disputed equipment locked inside the deserted building. However, shortly thereafter, the Bank, for a reduction in the rent it was paying, allowed a third party to occupy the building and to use the disputed equipment in the third party's business. When Hill visited the site in the spring of 1994, he discovered that some of the disputed equipment was no longer being used and that it had been placed outside the building. On a later visit, Hill found that all of the equipment was being stored outside the building.
On June 26, 1996, Industrial filed a "motion for emergency relief," seeking an order "enjoining and prohibiting the sale and/or removal of [its] equipment by [the] Bank ... or [by] the ... landlord of the premises where the equipment owned by Richard Hill and/or [Industrial] [was] located." The injunction was necessary, because, Industrial alleged, the Bank was threatening, at the instance of the landlord, to sell the equipment on June 26, 1996, if it was not removed from the premises by that date. The motion further stated:
"That previously in this action, at [the] Bank's officer's deposition, [Industrial] discovered that some of the equipment owned by [Industrial] had been sold. After this discovery, it was subsequently learned at the mediation that additional equipment had been sold after notice had been made on the parties arranging for the sale of the equipment on behalf of the Bank, was well as by the Bank itself. The equipment has been reduced to salvageable condition, but the Defendants Richard Hill and/or [Industrial] are still desirous of obtaining said equipment back in its current condition."

(Emphasis added.)
That same day, the trial court entered an order authorizing Industrial to "go upon the premises" and remove its equipment by 5:00 p.m., June 30, 1996. Pursuant to that order, Hill retrieved what remained of the equipment.
Trial of the case began on December 3, 2001. At the close of all the evidence, each party moved for a judgment as a matter of law ("JML") on various grounds. In addition, the Bank requested that the following jury instructions be given:
The Bank's Requested Charge No. 5: "Members of the jury, if you are reasonably satisfied from the evidence that [Industrial] could have, in the exercise of ordinary care, recovered possession of all or a portion of the personal property which it claims the right to [possess] then in such event, [Industrial] would not be entitled to recover damages against [the] Bank for that period of detention after the time in which [Industrial] could have reasonably recovered possession of the goods which it claims the right to possess."
The Bank's Requested Charge No. 6: "Members of the jury, I charge you that under the applicable Alabama law when one party seeks to attach or execute by legal means personal property belonging to another, any person who claims to hold title to that same property has the right to take possession of that property by filing with the court a sworn affidavit that it holds title to the property, and by posting a bond in an amount double to the value of the property levied on and claimed. Upon the filing of such affidavit and posting of such bond, the personal property must be delivered to the possession of the party claiming title to it."
The trial court refused those charges.
The Bank's claim against Industrial, and Industrial's conversion counterclaim *824 against the Bank, were submitted to a jury. Regarding the Bank's claim, the jury was instructed to determine which entity, the Bank or Industrial, possessed a "superior interest in the disputed property." The jury returned a verdict in favor of Industrial, awarding $148,000 in compensatory damages and $250,000 in punitive damages.[3] The trial court entered a judgment on that verdict in the amount of $480,310, that is, the amount of the verdict plus $82,310 interest.
The Bank filed a posttrial motion, arguing, in material part, that the trial court had erred (1) in refusing to charge the jury on mitigation of damages, and (2) in denying its motion for a JML, which challenged the sufficiency of the evidence of conduct that would support an award of punitive damages. Also, the Bank arguedfor the first timethat the court erred in "enter[ing] a judgment in favor of [Industrial] for compensatory damages in the amount of $148,000, based upon the uncontroverted testimony that [Industrial] could have recovered immediate possession of the ... equipment ... by complying with statutory detinue requirements provided by [Ala.Code 1975, § 6-6-250]." The trial court granted the motion only insofar as it related to punitive damages, and it vacated the punitive-damages award.
Subsequently, Industrial filed a motion to alter, amend, or vacate the judgment, or, in the alternative, for a new trial. On June 12, 2002, the trial court entered an order denying that motion. Industrial appealed, and the Bank cross-appealed. For ease of discussion, we first address the Bank's cross-appeal.

I. The Bank's Cross-Appeal
The Bank presents one issue on cross-appeal: "Whether the trial court erred in denying [the Bank's] motion for judgment as a matter of law on the claims of [Industrial] for conversion in light of the uncontroverted evidence that [Industrial] had failed to mitigate its damages." The Bank's brief, at 12 (emphasis added). In that connection, the Bank argues:
"[Industrial] should, in the exercise of reasonable care, have taken steps to secure possession of the equipment to which it claimed title, after [ADPI] abandoned the equipment in May 1992 and before [the Bank] assumed control of the building where the equipment was stored in September 1992. Secondly, when [the Bank] assumed control of the building where the equipment was stored, [Industrial], in the exercise of reasonable care and to protect its own interest, should have exercised its rights under Alabama's detinue statute, [Ala. Code 1975, § 6-6-250,] in order to obtain immediate possession of the equipment. Either way, the exercise of due care by [Industrial] would have either eliminated or greatly reduced any loss or claim for damage, and certainly would have eliminated or greatly reduced the claim for interest, that it might otherwise have suffered."
Id. at 27 (emphasis added). For these reasons, the Bank contends, it was entitled to a JML, because of the insufficiency of the evidence on the damages element of Industrial's conversion claim. Id. at 62. In the alternative, it argues, it was entitled to a JML "on the trial court's award of interest to [Industrial] for a period of approximately nine years." Id. at 64-65.[4]
*825 We pretermit any consideration of the sufficiency of the evidence of compensatory damages or interest, because the Bank failed to preserve those issues for review. This is so, because they were raised for the first time in the Bank's posttrial motion.
It is well-established that "a timely post-trial motion [for a JML] is necessary to permit an appellate court to consider the sufficiency of the evidence." Great Atl. & Pac. Tea Co. v. Sealy, 374 So.2d 877, 880 (Ala.1979); see also Joseph Land & Co. v. Gresham, 603 So.2d 923, 927-28 (Ala.1992); King Mines Resort, Inc. v. Malachi Mining & Minerals, Inc., 518 So.2d 714, 716 (Ala.1987). However, "[i]t is a procedural absolute that a [posttrial motion for a JML], based on the `insufficiency of the evidence,' is improper, if the party has not moved for a [JML] on the same ground at the close of all the evidence." Barnes v. Dale, 530 So.2d 770, 776 (Ala.1988) (emphasis added).
At the close of all the evidence, the Bank filed the following written motion:
"1. [Industrial] has failed to carry the burden of proof to show a clear and unequivocal right to possession of the machinery and equipment for which [the Bank] received notice of [a] claim.
"2. [Industrial], being a corporate entity, is without authority to pursue any action in the courts of this state, having failed to comply with the provisions of Section 10-2B-16.22, Code of Alabama of 1975, as amended, and is therefore not in good standing as a corporate entity in the State of Alabama.
"3. The uncontroverted evidence reveals that [Industrial] failed to follow the provisions of the United States Bankruptcy Code before receiving title to assets of [ADPI], a debtor in bankruptcy, in that [Industrial], a corporate entity, received no permission from the Bankruptcy Court pursuant to Section 363 of the United States Bankruptcy Code and Rule 4001(b) of the Rules of Bankruptcy Procedure in order to take a secured position in any asset of the bankrupt debtor. Therefore, the attempted transfer of assets including machinery, equipment and accounts receivable from the bankrupt debtor to [Industrial] was void.
"4. [Industrial] received no permission from the Bankruptcy Court to take a secured position in the accounts receivable of the debtor, [ADPI], or to have transferred assets from a bankrupt debtor, all in violation of Section 363, of the United States Bankruptcy Code and Rule 4001(b) of the Rules of Bankruptcy Procedure. The only security for the loans to be made to [ADPI], were in the form of an administrative priority, giving the creditor priority over other administrative expenses. Therefore, assets of [ADPI], having been obtained in violation of the United States Bankruptcy Code, such transactions are void.
"5. [Industrial] has failed to prove substantial evidence that [the Bank] acted in a willful, wanton, or intentional manner at the time of the alleged act of conversion.
"6. [Industrial] has failed to prove substantial evidence of mental anguish."
The Bank's oral motion for a JML tracked these arguments. These arguments simply do not include a challenge to the sufficiency of the evidence of compensatory damages, especially on the ground that Industrial failed to pursue alleged statutory remedies in a timely manner. Because that argument was first raised in *826 a posttrial motion for a JML, it is not reviewable.
To be sure, the Bank did request that the jury be instructed on Industrial's duty to mitigate damages. Of course, "`[a] party is entitled to proper jury instructions regarding the issues presented, and an incorrect or misleading charge may be the basis of the granting of a new trial.'" H.R.H. Metals, Inc. v. Miller, 833 So.2d 18, 28 (Ala.2002) (quoting Nunn v. Whitworth, 545 So.2d 766, 767 (Ala.1989)). In other words, the remedy for a trial court's having given an improper jury instruction is a new trial, not a JML.
However, the Bank does not request a new trial. It requests only a JML on the element of damages, or, in the alternative, a JML on the award of interest. The question of the Bank's right to a JML on the issue of compensatory damages was not preserved. Consequently, there is no merit in the Bank's cross-appeal.

II. Industrial's Appeal
Industrial raises a number of issues on appeal. However, the relief it requests is stated in the alternative. It urges this Court to reverse on various grounds the judgment of the trial court and remand the cause for a new trial, or, in the alternative, to reinstate the jury's punitive-damages award. We conclude that the trial court erred in vacating the jury's punitive-damages award, and we resolve this case on that basis.
At the outset, we note that the Bank does not challenge the amount of the punitive-damages award. In other words, it contends that no punitive-damages award was authorized by the facts, not that the amount awarded was excessive. Thus, we are not invited to consider the "guideposts" established in BMW of North America, Inc. v. Gore, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996), or the factors set forth in Green Oil Co. v. Hornsby, 539 So.2d 218 (Ala.1989). We determine only whether the punitive-damages issue was properly submitted to the jury for its decision.
We begin our discussion with the following principles in view: "Conversion is an intentional tort.... `The intent required is not necessarily a matter of conscious wrongdoing. It is rather an intent to exercise a dominion or control over the goods [of the plaintiff] which is in fact inconsistent with the plaintiff's rights.'" Johnson v. Northpointe Apartments, 744 So.2d 899, 904 (Ala.1999) (quoting W. Keeton, Prosser & Keeton on Torts § 15 (5th ed.1984)). "Intentional torts ordinarily carry punitive damages, if the jury chooses to award them." Tillis Trucking Co. v. Moses, 748 So.2d 874, 887 n. 12 (Ala.1999). Indeed, "[p]unitive damages are recoverable in a conversion case when the evidence shows legal malice, willfulness, insult, or other aggravating circumstances." Schwertfeger v. Moorehouse, 569 So.2d 322, 324 (Ala.1990) (emphasis added). "`[P]unitive damages [in an action for conversion] are justified when the evidence discloses the conversion to have been committed in known violation of law and of owner's rights, with circumstances of insult, or contumely, or malice.'" Roberson v. Ammons, 477 So.2d 957, 961 (Ala.1985) (quoting Carolina Cas. Ins. Co. v. Tisdale, 46 Ala.App. 50, 57, 237 So.2d 855, 859-60 (1970)). "The conversion committed in known violation of the law and of plaintiffs' rights is itself legal insult, contumely, or malice sufficient to justify an award of punitive damages." 477 So.2d at 961 (emphasis added).
Consistent with Ala.Code 1975, § 6-11-20(a), a punitive-damages award will not be vacated where the evidence supporting the award is "of such quality and weight that a jury of reasonable and fair-minded persons could find by clear and convincing evidence," Ex parte Norwood *827 Hodges Motor Co., 680 So.2d 245, 249 (Ala.1996), that the conversion was associated with "malice, willfulness, insult, or other aggravating circumstances."[5]
The trial court, in a posttrial order, stated:
"As to insult or malice, [Industrial] points to evidence that in March 1993, when its officer, Richard Hill, went to Scottsboro to investigate the situation, the Bank's counsel informed him that if he tried to retrieve the property, he would be arrested. This conduct did not occur at the time of the conversion, but more than a year thereafter and subsequent to the Bank's filing this declaratory judgment action to determine the superiority of the claims. This statement cannot be the basis for a punitive damage[s] award. See Treadwell Ford, Inc. v. Wallace, 49 Ala.App. 308, 271 So.2d 505 ([Ala.] Civ.App.1973)."
(Emphasis added.) Expanding on that theme, the Bank argues:
"The trial court correctly relied upon [Treadwell Ford, Inc. v. Wallace, 49 Ala. App. 308, 271 So.2d 505 (Ala.Civ.App. 1973),] in determining that, in order to be actionable, any so-called `rude or insulting' language or conduct directed toward [Industrial] must have occurred at the time of conversion, which was September 1992. Any allegedly rude or insulting conduct directed to [Industrial] at a time other than at the time of conversion simply cannot support an award of punitive damages."
The Bank's brief, at 47 (emphasis in original).
Thus, relying on Treadwell Ford, Inc. v. Wallace, 49 Ala.App. 308, 271 So.2d 505 (Ala.Civ.App.1973), the Bank argues that nothing that transpires between the plaintiff and the defendant after the date of the alleged conversion is relevant to the plaintiff's conversion claim. Industrial contends that current Alabama law does deem relevant conduct that postdates the conversion. We agree with Industrial.
Caselaw is replete with opinions attesting to the relevance of conduct occurring after the conversion. Indeed, where punitive damages are sought, "[e]vidence of any fact which legitimately tends to show the motive and spirit of the defendant in doing the act complained of is admissible in an action for conversion." 18 Am.Jur.2d Conversion § 168 (1985) (emphasis added; footnote omitted). In particular, a defendant's ongoing refusal with associated conductto return property upon demand is evidence of legal insult, contumely, or malice. In other words, even where the initial taking by the defendant was not tortious, "`the retention of the personalty after demand for its return' " may present a question of fact "`on the issue of punitive damages.'" Walt Bennett Ford, Inc. v. Keck, 298 Ark. 424, 428, 768 S.W.2d 28, 30 (1989) (quoting Ford Motor Credit Co. v. Herring, 267 Ark. 201, 206-07, 589 S.W.2d 584, 588 (1979)) (emphasis added).
The dispute in Keck began when Richard Keck took his Yugo automobile to Walt Bennett Ford, Inc. ("Bennett"), for repairs. 298 Ark. at 425, 768 S.W.2d at 28.
*828 Bennett provided Keck with a substitute automobile to use while his Yugo was being repaired. 298 Ark. at 425-26, 768 S.W.2d at 29. After seven weeks, Keck returned to Bennett to pick up his Yugo. However, when Keck refused to pay $1,200 as the rental amount for the substitute automobile, Bennett refused to release the Yugo. It was "undisputed that all repairs to the Yugo were warranty repairs, that Keck owed [Bennett] nothing for the repairs, and that the lease agreement form for the substitute automobile did not grant the dealer a possessory lien on the [Yugo]." 298 Ark. at 426, 768 S.W.2d at 29.
In Keck's action against Bennett for conversion, a jury awarded Keck $6,337 in compensatory damages and $25,000 in punitive damages. 298 Ark. at 426, 768 S.W.2d at 29. Bennett appealed, contending that the "trial court erred in submitting the issue of punitive damages to the jury." 298 Ark. at 427, 768 S.W.2d at 30. The Arkansas Supreme Court affirmed, explaining:
"[Bennett's] conduct of retaining the Yugo even through the trial, thirteen months after the demand for surrender, without any claim of mistake or privilege or other legal right to do so, presents a submissible issue on punitive damages. The jury reasonably could have concluded that [Bennett] withheld Keck's property, his means of transportation, with the intent of causing him such inconvenience and damage that he would be coerced into the payment of a questionable debt. [Bennett] continued this course of conduct even after it was sued for conversion, obtained legal counsel and filed a counterclaim for the disputed rental. The evidence is sufficient to support a finding of intent to cause damage."
298 Ark. at 428, 768 S.W.2d at 30 (emphasis added).
In Smiley v. Cardin, 655 S.W.2d 114 (Mo.Ct.App.1983), the court affirmed a $10,000 punitive-damages award in favor of a tenant in the tenant's action against her former landlord for conversion of her household appliances. 655 S.W.2d at 115. The tenant made at least two demands for release of her appliances. In response to the first demand, the landlord "`just kind of snickered' and said he would [release them] when paid some back rent he claimed she owed." Id. Subsequently, the tenant's lawyer "wrote [the landlord] demanding the return of the appliances but obtained no response. [The tenant] then, for the second time, asked for the appliances but received from the [landlord] another `snicker' and assurances the items would be returned when plaintiff paid her debt." 655 S.W.2d at 115-16. On still another occasion, the tenant's lawyer telephoned the landlord to explain "that he was legally bound to return to [the tenant] the property he had come by through self-help." 655 S.W.2d at 116. During that conversation, the landlord directed an obscene remark to the lawyer.
On appeal, the landlord contended that the "trial court erred by awarding [the tenant] $10,000 in punitive damages because [her] evidence ... failed to establish that [the landlord's] acts were characterized by actual malice or that [he had] willfully and wantonly attempted in injure [her]." 655 S.W.2d at 116. The appellate court disagreed. In affirming the punitive-damages award, the court explained: "[The landlord's] treatment of [the tenant] after being advised by counsel, both by letter and telephone, that he was withholding [the tenant's] property illegally and [the landlord's] admitted obscene direction to the attorney, demonstrates the spite and ill will which motivated [his] conduct in the matter." 655 S.W.2d at 117.
*829 Thus, the basis for punitive damages in both Keck and Smiley was the continued withholding of the converted property without legal justification. Smiley, of course, contained an additional basis, namely, the defendant's use of an obscenity during a conversation with the plaintiff's lawyer after the conversion had occurred. See Ford Motor Credit Co. v. Spicer, 144 Ga.App. 383, 388, 241 S.E.2d 273, 277 (1977) ("From the fact that Ford Motor Credit Company continued to withhold plaintiff's automobile after learning of its error in crediting payment ... to the wrong account ..., the jury[, which awarded punitive damages of $38,500,] was authorized to infer that the repossession was malicious from the time it was carried out...."); Lack's Stores, Inc. v. Waisath, 479 S.W.2d 406, 408 (Tex.Civ.App.1972) (the defendant's "continued refusal to return plaintiff's furniture" constituted "aggravating circumstances," so as to justify an award of punitive damages in an action for conversion); see also Ford Motor Credit Co. v. Herring, 267 Ark. at 207, 589 S.W.2d at 588 ("although the [initial] taking was proper, the retention of the personalty after demand for its return constituted a submissible fact question on the issue of punitive damages"); Hinton v. State Farm Mut. Auto. Ins. Co., 741 S.W.2d 696 (Mo.Ct.App.1988).
Our own caselaw is in accord. For example, in Brown v. Campbell, 536 So.2d 920 (Ala.1988), this Court affirmed a judgment entered on a jury verdict, awarding $5,000 in compensatory damages and $10,000 in punitive damages to Jerry Campbell in his action against Dwight Brown and Lendon Brown for fraud and for conversion of a stock certificate. "Campbell's suit alleged that the Browns had fraudulently induced him to transfer his 250 shares of stock in Brown Tables, Inc., and had converted his certificate (representing 20% of the corporation) during the period from July 10, 1986, to November 5, 1986." 536 So.2d at 921.
The stock transfer occurred on June 10, 1986, in response to an allegedly fraudulent request from the Browns. Id. At that time, Campbell was a "plant manager" for Brown Tables, Inc. The next day, "the Browns fired Campbell." 536 So.2d at 921. Approximately 10 days later, Campbell demanded the return of his stock certificate. He was told, however, that the certificate could not be located, "but that [the Browns'] attorney might have it." 536 So.2d at 921. "Campbell then asked [the Browns'] attorney for the certificate; it was returned to Campbell by the attorney November 5, 1986, some three weeks after he had sued the Browns and Brown Tables, Inc." Id. (emphasis added).
On appeal, the Browns argued that "Campbell failed to prove damages on both the conversion claim and on the fraud claim." 536 So.2d at 921. This Court rejected both arguments. Regarding the conversion claim, this Court said: "There was clearly ample evidence that the Browns refused to surrender Campbell's certificate after he requested it, ... as well as of actual pecuniary loss by Campbell; this evidence supports the award of both compensatory and punitive damages." Id. at 921-22. The basis mentioned in Brown for punitive damages on the conversion claim was the continued withholding of the certificate from Campbell for approximately five months, in the face of repeated requests for its return. In other words, this Court deemed the Browns' continuing refusal to be "ample evidence" of the sort of aggravating circumstances that will support an award of punitive damages. Id. at 921.
The Court of Civil Appeals reached a similar conclusion in Liberty National Life Insurance Co. v. Caddell, 701 So.2d 1132 (Ala.Civ.App.1997). In that case, *830 Liberty National Life Insurance Company ("Liberty National") appealed from a judgment entered on a jury verdict awarding Liberty National's insured, Michael Caddell, $50,000 in compensatory damages and $100,000 in punitive damages, on Caddell's claim against Liberty National for conversion of cash. Id. at 1133. The jury concluded that Liberty National had converted premium payments that were due Caddell, as the result of his decision to cash in his life insurance policy and annuity rider. Id.
Caddell submitted to Liberty National the completed forms necessary to cash in the policy and annuity in March 1994. At that time, Liberty National was deducting the "monthly policy and annuity rider premium" by "electronic funds transfer or `bank draft' directly from [Caddell's] bank account." Id. In March 1994, Thomas Rotton, Liberty National's agent, received from Caddell the completed forms, and told Caddell "that he would have the bank drafts stopped and that the forms completed... were all Caddell needed in order to cash in his policy. Caddell never heard from or saw Rotton again." Id. at 1134.
That month "Caddell received a $2,158.06 check from Liberty National." Id. However, that check represented only "the cash value of the annuity portion of the policy." Id. Liberty National continued to draft from Caddell's account the premiums for the life insurance policy. Caddell's subsequent attempts to stop the automatic drafts and collect the proceeds of his policy are thoroughly chronicled as follows:
"In March 1994, Caddell received a $ 2,158.06 check from Liberty National representing the cash value of the annuity portion of the policy. Upon receipt of this check, Caddell telephoned the Liberty National office in Eufaula to inquire about the balance of his funds. Caddell stated that he was told he would receive the balance of his funds in a couple of weeks. Caddell's March 8, 1994, bank statement indicates that $ 80.65 was drafted from his account.
"In April 1994, $ 45.65 was drafted from Caddell's bank account. He called the Liberty National office to ask why Liberty National was still drafting his account. He stated that he was told by a Liberty National representative that Liberty National would `look into it' and that `it would be taken care of.' Caddell's June 7, 1994, bank statement indicates that $ 45.65 was drafted from his account twice during the month of June. Caddell again contacted Liberty National and, again, was told that Liberty National would `look into it.' Caddell's wife attempted to have the bank drafts stopped in March 1994, by completing a `stop payment' form at the bank; however, this attempt failed. It was not until after she had contacted the bank in June 1994, after receiving the bank statement, and asked that the bank drafts be stopped that the drafts on Caddell's account were stopped.
"Between January and June 1994, all contact with Liberty National had been initiated by Caddell; Liberty National had never contacted Caddell about the problems with the bank drafts. Caddell contacted his attorney in June 1994. That same month, he received a cash surrender request form from Liberty National, which he turned over to his attorney. In September 1994, Caddell received from Liberty National an `automatic loan receipt' indicating that it had deducted $ 84.52 from the cash value of his policy. In November 1994, Caddell received from Liberty National another `automatic loan receipt' indicating that it had deducted $ 592.79 from the cash value of the policy. In November 1995, one year after Caddell had filed his *831 lawsuit, he received the balance of the cash value from his policy."
Id. (emphasis added). Before trial, Liberty National "returned the premiums, plus interest, that had been deducted from Caddell's bank account after Caddell had requested the cancellation of the insurance policy." Id. at 1135.
On appeal, Liberty National contended that "the trial court erred in submitting the issue of punitive damages to the jury and that the evidence [did] not support an award of punitive damages." Id. at 1136. The Court of Civil Appeals disagreed, stating:
"Caddell presented evidence that Liberty National had wrongfully deducted premium payments from his bank account after he was told that he had completed the forms necessary to cash in the policy and annuity rider. The evidence indicated that after each draft on his account Caddell contacted Liberty National and that each time he was told that Liberty National would `look into it' and that `it would be taken care of.' Caddell also presented evidence that Liberty National did not correct its error and that he did not receive a refund of those payments and interest until he had hired an attorney and filed a lawsuit."

Id. (emphasis added). Consequently, the court affirmed the judgment awarding punitive damages.
Like Brown, Caddell involved no rude or insulting behavior. As in Brown, the basis articulated in Caddell for the punitive damages award was the continued withholding of the converted property without legal justification, causing the inconvenience and expense of a lawsuit. Neither case involved rude or insulting language, either at the time of conversion or afterward. Nevertheless, the retention of converted property in the face of a demand for its return is post-conversion conduct, which is material to the issue of punitive damages. These cases, therefore, as well as those from the other jurisdictions discussed above, refute the Bank's argument that the defendant's post-conversion conduct is irrelevant to the plaintiff's conversion claim. To the extent Treadwell Ford, Inc. v. Wallace, 49 Ala.App. 308, 271 So.2d 505 (1973), and Progressive Finance Co. v. Milner, 45 Ala.App. 684, 236 So.2d 349 (1970), on which Treadwell relied, are inconsistent with this opinion, they are overruled.
The rule to be drawn from the cases discussed above compels the conclusion that the trial court erred in vacating the jury's punitive-damages award. In this case, it is undisputed that the Bank converted Industrial's equipment,[6] and there is ample evidence that it did so knowingly and with legal malice. The Bank took possession of Industrial's equipment in September 1992. In fact, the Bank had notice, through Industrial's letter of July 13, 1992, that is, before it acquired possession, that Industrial was claiming equipment that was located on the premises of ADPI. Industrial made a formal demand for the return of that equipment in a letter dated March 17, 1993. That same month, Industrial presented bills of sale and invoices from various companies, many dating from and after November 30, 1989, which showed Industrial as the purchaser of the equipment it claimed. The Bank summarily *832 rejected Industrial's offer of proof of ownership. In fact, the Bank's counsel responded to the offer of proof by threatening Hill with incarceration.
Indeed, following the cessation of business by ADPI, the Bank soughtand the trial court grantedpossession only of the equipment described on the asset list the Bank had filed with its UCC financing statement on March 28, 1988. Obviously, the asset list did not contain items that were purchased by Industrial and evidenced by invoices and bills of sale dating from November 30, 1989. Nevertheless, the Bank made clear in its letter to Industrial's counsel on March 2, 1993, that it was claiming a security interest in all the equipment on the premises.
Notwithstanding the fact that Hill remained obviously solicitous of his equipment, the Bank continued to withhold the machinery for more than three years after receiving extensive evidence of Industrial's ownership. It was not until June 1996, in connection with the Bank's alleged renewed threat to dispose of the equipment, that Industrial was able to reclaim what remained of its property, following the effects of weather, unauthorized use, and sale. By that time, according to Hill, the equipment was "ruined."
In short, the Bank converted Industrial's personalty and retained it for almost four years, without an articulated, arguable excuse.[7] Even without rude or insulting language or conduct, taking and withholding personalty in knowing violation of the plaintiff's rights "is itself legal insult, contumely, or malice sufficient to justify an award of punitive damages." Roberson v. Ammons, 477 So.2d at 961; see also Brown v. Campbell, supra; Liberty Nat'l Life Ins. Co. v. Caddell, supra.
This case, however, does involve such aggravating circumstances. In the letter of March 2, 1993, to Industrial's counsel, counsel for the Bank threatened Hill and Industrial with claims for "all consequential damages because of their interference with the Bank's" attempts to sell the equipment. Later that month, counsel for the Bank, in a personal encounter with Hill, threatened Hill with criminal prosecution.
The post-conversion conduct in this case, namely, the threats and intimidation, coupled with the Bank's retention of the equipment for approximately four years, is relevant to the issue, and clearly supports the imposition, of punitive damages. The trial court erred, therefore, in vacating the jury's punitive-damages award.

III. Summary
In summary, that portion of the judgment based on the jury's award of compensatory damages and the interest thereon is affirmed. However, the judgment, to the extent it vacated the jury's award of punitive damages, is reversed, and the cause is remanded for reinstatement of the jury's verdict.
1011966REVERSED AND REMANDED.
HOUSTON, LYONS, BROWN, JOHNSTONE, and STUART, JJ., concur.
MOORE, C.J., and SEE and HARWOOD, JJ., concur in the result.
1012064AFFIRMED.
MOORE, C.J., and HOUSTON, SEE, LYONS, BROWN, JOHNSTONE, HARWOOD, and STUART, JJ., concur.
*833 MOORE, Chief Justice (concurring in case no. 1012064 and concurring in the result in case no. 1011966).
I concur in affirming that portion of the judgment of the trial court refusing to vacate the jury's award of compensatory damages and the interest on that award, and I concur in the result insofar as the majority reverses the judgment of the trial court setting aside the jury's award of punitive damages. I agree that this case should be remanded to the trial court for reinstatement of the punitive-damages award because I believe that sufficient evidence exists for the award of such damages based upon the Bank's seizure of property it knew at the time of the seizure belonged to Industrial and the refusal by the Bank to release that equipment after Industrial made repeated requests for the equipment.
Punitive damages are recoverable in a conversion action "`where the evidence shows legal malice, willfulness, insult, or other aggravating circumstances.'" Rainsville Bank v. Willingham, 485 So.2d 319, 324 (Ala.1986) (quoting Ray Hughes Chevrolet, Inc. v. Gordon, 294 Ala. 638, 639, 320 So.2d 652, 654 (1975)). The jury was clearly entitled to find that the actions of the Bank were willful, malicious, and without justification in light of a court order stating that the Bank was only "entitled to immediate possession of the equipment listed on [ADPI's `asset list' filed with the Bank's UCC financing statement]." The Bank knew that part of the property it intended to seize was owned by Industrial and was not listed on ADPI's asset list. The Bank disregarded the explicit provisions of the court's order, and seized property belonging to Industrial, knowing it was not entitled to do so, which in itself may be sufficient to support the award of punitive damages. Refusal to release that property after repeated requests therefor is further evidence of the Bank's intent to convert the property.
NOTES
[1] Our review also included Ex parte Indus. Techs., Inc. (No. 1980079, November 6, 1998) (mandamus petition denied, without an opinion).
[2] The Bank eventually acquired a default judgment against ADPI. None of the Bank's claims against that entity are material to this appeal.
[3] The jury found that the Bank had a "superior interest" in two items of equipment. That finding is not material to this appeal. See note 7.
[4] "Under the [detinue] statute and the facts of this case," the Bank argues, "the appropriate period of time [on which to base an interest calculation] would be five days.." The Bank's brief, at 63 (emphasis added).
[5] In that connection, "[t]his Court [has] held that in order for a judge to submit the issue of punitive damages to the jury as the trier of fact, the judge must be satisfied by substantial evidence." Knight v. Beverly Health Care Bay Manor Health Care Ctr., 820 So.2d 92, 100 n. 5 (Ala.2001). "Then, the jury must be satisfied that the plaintiff has presented clear and convincing evidence to support the punitive damages award." Id. See also Omni Ins. Co. v. Foreman, 802 So.2d 195, 198 (Ala.2001) ("when an injured person sues a tortfeasor and offers substantial evidence of conduct that this Court has recognized as appropriate to support an award of punitive damages, the trial court that takes the issue of punitive damages from a jury will see its judgment reversed").
[6] The Bank does not argue here, as it did in the trial court, that Industrial "failed to carry the burden of proof to show a clear and unequivocal right to possession of the machinery." Thus, for the purposes of this appeal, the Bank effectively concedes that it converted Industrial's equipment and does not purport to justify the taking or retention of the equipment.
[7] It is immaterial whether there was an arguable basis for withholding some items of equipment claimed by the parties. Indeed, the jury found that the Bank properly retained two items. The right to retain some is not the right to retain others, namely, those items of equipment that belonged irrefutably to Industrial.